28  465
31  152
31  592
31  637
28  465
34  337
28  465
35  421
135  468
37  634
39  260

## THOMAS J. FULCHER v. THE STATE.

### *No. 2833.   Decided March 12.*

1.  **Practice—Evidence.**—On a trial for murder the witness B. testified, for the State, that during the summer before the homicide the deceased gave him a letter to defendant, and told him to tell defendant on delivering it that if he, defendant, did not "bring his things back he would get them by law; that he had been to Estacado and found out what the law was." The witness A. was also permitted to testify that defendant's wife told him that when B. delivered the said letter to her for her husband—the latter being absent—he told her that deceased requested him to say to defendant that if he did not return his property he would have both him and his wife arrested for theft. The objection urged to this proof was that defendant was not present on either occasion. But *held:* The proof showing that the defendant knew all about the said letter, that it was read in his presence, and that the matter of the return of the deceased's property was discussed by the witness A., the defendant, and the defendant's wife, the error, if any, was without prejudice.

2.  **Same.**—The witness C. was permitted to testify that on the second night after the shooting the defendant was arrested and was brought into the presence of the deceased, when deceased identified him as the man who shot him. It was objected that this was the mere expression of opinion. But *held,* that the evidence was competent under the rule that "when the opinion is the mere shorthand rendering of the facts, then the opinion can be given, subject to cross-examination as to the facts upon which it is based."

3.  **Same.**—The defense objected to proof of the declarations of deceased to the witness C., about thirty minutes after the shooting, as to the shooting, as to the circumstances of the shooting, and the person who shot him. The proof shows that the witness reached the deceased about fifteen minutes after the shooting; that deceased's throat was then so clogged with blood he could not articulate; that witness administered a draught to remove the blood, and that about fifteen minutes later the deceased became able to speak clearly, and made the statements objected to. *Held,* that under the circumstances the declaration was *res gestœ,* and as such was properly admitted.

4.  **Same — Dying Declarations — Predicate.** — As a predicate for proof of the dying declarations of deceased, the witness testified that the declarations were voluntarily made, and not in reply to questions asked him; that deceased was sane when he made them, and was conscious of approaching death, and declared, in connection with his said declaration, that he could not possibly recover, but was bound to die. *Held,* sufficient as a predicate.

5.  **Same—Case Approved.**—In the cases of Cordova v. The State, 6 Texas Court of Appeals, 208, and Handline v. The State, Id., 348, the doctrine was announced that "the acts and conduct of the defendant in arrest, either before or after being accused with the crime may, though not *res gestœ,* be competent evidence against him as indicative of a guilty mind." But this doctrine was overruled in Nolen's case, 14 Texas Court of Appeals, 474 (which is approved), and the rule as it now obtains is that "where the confessions of a defendant under arrest are inadmissible against him because made while he was uncautioned, his acts, if tantamount to such confession and done under similar circumstances, are likewise inadmissible." Note this case for an application of the rule.

6.  **Same—Assault to Murder—Charge of the Court.**—The proof in the case not presenting the issue of assault with intent to murder, the court did not err in refusing a correct instruction upon that issue, however correct in principle it may have been. Under the same circumstances the defendant can not be heard to complain of a charge upon that issue, which in any event was more favorable to him than he was entitled to.

7.  **Same—Practice—Testimony of Defendant in His Own Behalf.**—The act

of 1889 which qualifies a defendant in a criminal cause to testify in his own behalf, prohibits counsel from commenting on the defendant's failure to exercise his right to testify, but does not prohibit the court from giving the said act in charge to the jury. The court is clothed with discretion in the matter of such charge, and in charging the substance of the act in this case the trial court did not abuse its discretion.

APPEAL from the District Court of Jones, on change of venue from Crosby. Tried below before Hon. J. V. Cockrell.

This conviction was in the first degree for the murder of A. Beemer, the penalty of death being assessed against the appellant.

The homicide occurred on the 10th day of September, 1887, at the Matador ranche, in Motley County, which county is attached to Crosby County for judicial purposes.

B. F. Brock was the first witness for the State. He testified that he lived in Dickens County, about twenty miles distant from the Matador ranche. Defendant and his wife lived at the witness's house during a part of the year 1886. In the summer of 1887 the witness secured work for the defendant with the haying "out fit" of one Latimer. About the middle of June, 1887, witness, traveling in his wagon, took the defendant to the hay camp. *En route* the defendant told the witness that there were two men in the country he, defendant, ought to kill, one of them being old man Beemer, and the other old man Brown. He said further that he had been trying to get old man Beemer out, and that if he could not catch him out he was going to where he was, "and God damn him, when we meet I will make him bite the earth." The witness made no reply to these threats. While defendant and his wife were living at the house of Mr. Askings in the summer of 1887, the witness took a letter from Beemer to defendant, which letter he delivered to defendant's wife in the absence of defendant. The feeling of the witness for defendant was not good, and was not good for some time before the killing. At the time the defendant uttered the threats against Beemer and Brown he and the witness were about twelve miles distant from the Matador ranche.

F. M. Wells testified for the State that he worked at the Latimer hay camp at the time defendant did. Witness left that camp to go home about September 7, 1887. Defendant went with him as far as Tepee City, where he left witness, saying that he was going to the house of Mr. Askings, where his wife was. En route to Tepee City the defendant told witness that he intended to kill Beemer; that he had heard that Beemer was going to get out a warrant for his, defendant's, arrest upon the charge of cattle theft; that he would have to get out his warrant damned quick, for his days on earth were dark and short. At Tepee City defendant gave witness a dollar and requested witness to buy him some 45-calibre pistol cartridges, and say nothing about it. Defendant and his wife came to witness's house on the Sunday preceding the fatal Wednesday. He left

on Tuesday, taking his pistol with him. The pistol exhibited belonged to the defendant, and was the one he took with him from witness's house on the said Tuesday. Witness went home on Thursday morning and found defendant and Boon and Stewart at his house. Defendant remarked that he was under arrest. Boon or Stewart replied, "Yes, we have him arrested for killing old man Beemer." Thereupon the defendant became very much excited, his color changing perceptibly.

Mr. Askings testified for the State, in substance, that he lived in Dickens County, about thirty miles from the Matador ranche. The witness Wells lived about thirty miles northeast from the witness. Defendant and his wife lived at witness's house during a part of the summer of 1887. Mrs. Fulcher, the wife of defendant, told witness about getting a letter from Beemer. She told the defendant, in witness's presence, what the letter contained, and defendant subsequently, in witness's presence, read that letter. Its contents, in substance, were that if defendant did not return his things he would have the defendant and his wife arrested; that he had been to Estacado and ascertained what the law was, and what it would cost to put the matter through, and that he would take the necessary steps unless the things were returned. Mrs. Fulcher then asked witness what she should do with the things, and witness advised her to them send to Beemer. She accordingly sent Beemer all of his things except his gun. A day or two afterwards defendant asked his wife if she had returned the things to Beemer. She told him that she had, and he replied, "That's all right; damn them, I didn't want them." Defendant left witness's house about September 1, 1887, telling witness that he was going to live at Wells's house. He borrowed of the witness a wagon and team when he moved, and returned them on the Monday or Tuesday before the killing of Beemer. On that day witness spoke to defendant about wearing a pistol. He replied that when he had had a settlement with Beemer he would leave the pistol at home, but that he would carry it until he had the settlement; that no man could talk about his wife as Beemer had and live in the country; that he had been trying to catch Beemer out, and that when he did Beemer would bite the dust. Defendant owned at that time and customarily rode a blue or red roan horse.

W. T. Cloyd testified for the State that he and others camped on the Colorado and Matador ranche road on the evening of the homicide. About an hour before sundown on that evening the witness saw a man riding a red roan horse traveling north toward the Matador ranche. The horse appeared to be jaded. A short while afterwards George Walker came to witness's camp from the direction of the Matador ranche.

F. M. Wells testified for the State that George Walker, the person referred to by the witness Cloyd, was dead. Witness heard Walker testify on the examining trial of the defendant. He testified, in substance, that

he met the defendant on the fatal evening traveling the public road toward the Matador ranche; that defendant had scattering whiskers on his face that evening, but was shaved at the time of the examining trial; that the man he met on the road, whom he was satisfied was the defendant, was riding a red roan horse, and wore a red scarf around his body, and a pistol belt with red thread woven through it. The witness Wells further testified that when defendant got to his house on the day after the homicide he was riding his red roan horse, and wore a scarf of red stuff about his waist, and a pistol belt with red thread woven through it. Defendant's wife was at witness's house on the fatal night, but the defendant was not.

J. M. Campbell testified for the State, in substance, that he was at the Matador headquarters in Motley County at the time of the shooting of Beemer. His house was situated but a short distance from Beemer's shop, in front of which the shooting occurred. Soon after the witness retired he heard two pistol shots fired at or near Beemer's shop. He went to his door and heard groaning, but got no reply to questions he asked in a loud voice. Witness then summoned other parties and started towards Beemer's shop. As he approached Beemer asked, "Are you going to let me lie here and die?" They found Beemer in front of his shop, lying on the ground, face down, and resting on his hands. His cot was overturned. On reaching Beemer witness inquired what the matter was. He replied, "I am shot twice." Witness asked who shot him, and he replied, "Tom Fulcher." Witness asked, "How do you know it was Fulcher?" and he answered, "How do I know you, Mr. Campbell?" The witness then returned to his house to get some brandy. While at the house he observed the clock, and found it to be then a few minutes after eleven o'clock. When he went back he found that Beemer had been taken into his shop. He administered some brandy and water, which so cleared Beemer's throat of blood that he was able to talk better. About fifteen minutes later Beemer got up and urinated, passing blood with his urine. Upon observing that blood, Beemer said, "Mr. Campbell, I am bound to die; I have seen many such wounds in the army, and they always die." He was perfectly sane when he made that statement. Witness then asked him to tell him how the shooting occurred, and he replied: "I was lying on my cot in front of my shop asleep, with my left hand over my head. I heard him twice call my name, 'Beemer! Beemer!' I looked and saw Fulcher holding his pistol a short distance from my head. I grabbed the pistol with the hand that was over my head. He pulled backward, pulled the pistol out of my hand, and shot me through the throat and tops of my shoulders. I fell back into my cot, the cot fell over, I fell off on my face, when he shot me in the back and ran off. I had hold of the pistol. It was in bad keeping and was rusty. You can easily identify it by that."

The witness Campbell further testified that after the defendant was arrested he was taken before Beemer, who identified him as the person who shot him.    About the fourth day after the shooting Beemer sent for witness to take his statement in writing, the witness being a notary public.    He was sane, was in his right mind, and declared his conviction that he could not recover, but would die.    He then made substantially the same statement he made to the witness on the night of the shooting, and the witness reduced it to writing.    This written declaration was read in evidence in connection with this witness's testimony.    A doctor reached Beemer on the third day after the shooting, and remained three days.

Nat John testified for the State that he was about the first person to reach Beemer after the shooting.    Beemer then told witness that Tom Fulcher shot him, and on the next morning, in reply to witness's question as to how he was getting on, he replied, "I am bound to die; my insides are torn all to pieces."    He then told the witness the particulars of the shooting, and again declared that he was shot by Tom Fulcher; that he knew Fulcher by his voice, had hold of him, and would know his teeth at any time or place.    The defendant's front teeth were very large and prominent.    Beemer was sane and in his right mind when he made the statements to the witness.

F. B. Dodson testified for the State that he was at the Matador ranche when Beemer was shot, and on that night went to Quannah to summon a physician.    Dr. Sumner went back with witness, dressed Beemer's wounds, and left some powders to be applied to the wound in the back to keep it from healing.    Witness was detailed to wait on Beemer, who was removed to the best house on the ranche.    Careful attendance was given to Beemer during his illness, and some person was with him pretty much all of the time.    The powders were applied according to the doctor's directions.    About three weeks after the shooting Beemer was removed to Fort Worth to secure better attention and care than could be had on the ranche.    The witness accompanied him to Fort Worth, and turned him over to Dr. Mullens.    Great care was taken in removing Beemer from the ranche to Fort Worth, but the wound in the back was partially healed, and was somewhat swollen when he was started.    He was taken to Childress on a mattress in a hack, and thence to Fort Worth by rail.

Dr. J. M. Mullens testified for the State that he was a practicing physician and lived in Forth Worth.    He received Beemer from Dodson in October, 1887.    Beemer's general condition was then very precarious.    A gun shot wound had passed through his neck, and another had passed through his kidney and the right lobe of his liver.    The latter wound was partially healed, but witness opened it and removed about half an ounce of pus.    The witness regarded the wound through the liver as a necessarily fatal wound, and as the immediate cause of Beemer's death.

Doctors Andrews and Hollis testified for the State that, in their opinion, founded upon Dr. Mullens's description of the wound through Beemer's. liver, it was a necessarily fatal wound.    The State closed.

Mrs. Combs was the first witness for the defense.    She testified, in substance, that she lived between twenty-five and thirty miles south from the Matador ranche.    Defendant was at her house twice on the day of the fatal night.    He left about sundown, going south, in the opposite direction from the Matador ranche, and said that he was going home. F. M. Wells's house was east of witness's house.    This witness denied that a few days after the shooting of Beemer she told Askings or J. M. Campbell that defendant left her house about four o'clock on the afternoon of the fatal day and went north.    Upon this point she was directly contradicted by Askings and Campbell when called in rebuttal.

Three witnesses for the defense testified that the defendant's reputation as a peaceable, law-abiding citizen was good.    One of them further testified that he and defendant were fellow-laborers in a hay camp in 1886. During their service two strangers came to the camp, and remained over night.    During the night one of the strangers, without warning anybody, shot a skunk.    At the report of the pistol Beemer sprang out of bed and ran off.    On the next day he asked the witness if the two men did not come from the Indian Nation.    He appeared to apprehend danger from parties from the Indian Nation, and repaired to camp headquarters, and secured orders for the two men to leave the camp.    From his actions the witness believed that he was afraid of Indian Nation people.

*F. G. Thurmond,* for appellant.

*W. L. Davidson,* Assistant Attorney-General, and *C. M. Christenberry,* for the State.

WHITE, PRESIDING JUDGE.—Appellant was convicted of murder of the first degree, his punishment being assessed at death.

Several bills of exception saved to the ruling of the court present the principal matters complained of as error.

1.    The defendant's first and third bills of exception relate to the same subject matter.    The witness Brock, over objections of the defendant, was permitted to testify as to a letter written by the deceased to the defendant the summer before the killing, and which deceased asked the witness to convey to the defendant, and at the same time requested witness to " tell defendant Fulcher that if he did not bring his things back to him that he would get them by law; that he had been to Estacado and found out what the law was."    The witness Askings was also permitted to testify, over objections of defendant, what was said by the witness Brock to defendant's wife at the time Brock delivered to her the letter written by deceased to

her husband, demanding the return of his property, and threatening in case the property was not returned that he, deceased, would have both defendant and his wife arrested for theft. The objection urged to the admissibility of this testimony was that defendant was not present on either of the occasions. It is amply established by other evidence in the case that defendant knew all about the letter deceased had written him concerning the return of his property—in fact, the letter was read in Fulcher's presence; and Askings says in his testimony that the whole subject of the return of the property was discussed in conversations between himself, the defendant, and defendant's wife. Under the circumstances, if the evidence had been illegal and inadmissible, its admission would have been harmless error, of which defendant could not complain.

2. Another exception was to the admission of the testimony of the witness Campbell to the effect that on the second night after the shooting defendant, after having been arrested, was brought back to the Matador ranche, and carried into the presence of the wounded man, and that "they spoke to each other, and Beemer identified Fulcher as the man who had shot him." Objection urged to this testimony is that it only shows the opinion of the witness. We think the evidence was admissible. " When the opinion is the mere shorthand rendering of the facts, then the opinion can be given, subject to cross-examination as to the facts upon which it is based." Whart. Crim. Ev., 9 ed., sec. 458; Willson's Crim. Stats., sec. 2502, p. 239; Powers v. The State, 23 Texas Ct. App., 43; Irvine v. The State, 26 Texas Ct. App., 37.

3. Bill of exception number five complains of the admission of the statements of the wounded man made to the witness Campbell about thirty minutes after he was shot, as to the circumstances of the shooting and who shot him. Deceased was shot in the neck, and his articulation was affected by the blood collecting in his throat. About fifteen minutes after he was shot Campbell administered to him some brandy and camphor to clear up his throat, and about fifteen minutes afterwards, when he was able to talk, deceased made the statements complained of. Under the circumstances shown we are of opinion the declarations were admissible as *res gestæ*. Willson's Crim. Stats., sec. 1046; Stagner v. The State, 9 Texas Ct. App., 441; Warren v. The State, Id., 619; Washington v. The State, 19 Texas Ct. App., 521; Pierson v. The State, 21 Texas Ct. App., 15; Smith v. The State, Id., 277; Irby v. The State, 25 Texas Ct. App., 203.

4. The witness Campbell was also permitted to testify as to the making of a dying declaration by deceased a few days after the shooting, which declaration was reduced to writing by witness, and sworn to by deceased before the witness as notary public; and in connection with this testimony said written declaration was also offered and read in evidence. In our opinion a proper predicate for the admission of the dying declara-

tions was laid, and the evidence was properly admitted. Willson's Crim. Stats., sec. 1045; Miller v. The State, 27 Texas Ct. App., 63.

Deceased was shot on the night of the 14th of September; a few days thereafter the dying declarations were made and reduced to writing, but deceased lived until the 4th day of November following. At the time he made the declarations we think it is clear that he then felt conscious of approaching death, and believed there was no hope of his recovery. There is no testimony showing that subsequent to making the declarations, and before his death, his mind ever changed as to his condition or as to his "immediate apprehension of death." Edmonson v. The State, 41 Texas, 497.

5. Defendant's second bill of exceptions shows that the State's witness Wells, on his examination in chief, was permitted, over defendant's objections, to testify that "the day after Beemer was killed, as I afterwards ascertained, I returned to my home about the middle of the afternoon. I found there Jeff Boon and Tom Stewart and (defendant) T. J. Fulcher. Stewart and Boon had arrested Fulcher and had him in custody when I arrived. I afterwards heard Stewart say to Fulcher, 'We have arrested you for killing Beemer last night,' whereupon Fulcher seemed agitated and turned pale." This testimony was objected to because the defendant was under arrest at the time. The court in explaining this bill states that he limited the witness's testimony to the fact as to whether or not any visible impression was made on defendant when he was charged with the murder. Had defendant not been under arrest there is no question but that his acts and conduct, as well as appearance when charged with the murder, would have been admissible as evidence against him. Noftsinger v. The State, 7 Texas Ct. App., 302. And even after arrest it was formerly held, in the cases of Cordova v. The State, 6 Texas Court of Appeals, 208, and Handline v. The State, Id., 348, that "the acts and conduct of a defendant in arrest, either before or after being accused with the crime, may, though not *res gestæ*, be competent evidence against him as indicative of a guilty mind." These decisions were based upon the rule announced in Roscoe's Criminal Evidence, 17–19, and the same rule is held in Brownell v. The People, 38 Michigan, 732 (which is a case directly in point), and in Greenfield v. The People, 85 New York, 75. It is also the rule announced in a late case in Kansas (The State v. Baldwin), reported in full in 9 Criminal Law Magazine, page 49. But a different rule was announced by this court in Nolen's case, 14 Texas Court of Appeals, 474, and it was there held that "where the confessions of a defendant under arrest are inadmissible against him because made while he was uncautioned, his acts, if tantamount to such a confession and done under similar circumstances, are likewise inadmissible." This decision, which practically overruled the Cordova and Handline cases, since its announce-

ment has been followed and recognized as the rule in this State. Carter v. The State, 23 Texas Ct. App., 508.

Under the rule as it now obtains the evidence complained of was illegal and inadmissible. This error will necessitate a reversal of the case. Mc-Williams v. The State, 44 Texas, 116. In view of another trial we will notice one or more of the other errors complained of.

6. It is insisted that the court should have charged upon assault with intent to murder, and that the special requested instructions asked for defendant should have been given. As to the requested instructions, we think they were properly refused. The evidence shows that the death was caused by the wound inflicted by defendant, and that there was no neglect or improper treatment of deceased. The charge of the court in relation to such an issue was not excepted to, and is more favorable to the accused than he would have been entitled to had there been such an issue in the case.

It is claimed that the court committed a fundamental error in instructing the jury in the fourth paragraph of the charge as follows, viz.: "The law allows the defendant to testify in his own behalf; but a failure to do so is not even a circumstance against him, and no presumption of guilt can be indulged in by the jury on account of such failure on his part."

The Act of our last Legislature providing that a defendant in a criminal case may testify in his own behalf expressly provides as follows:

"But the failure of any defendant to so testify shall not be taken as a circumstance against him, nor shall the same be alluded to or commented on by counsel in the cause." Gen. Laws, 21 Leg., p. 37.

The instruction was substantially in the spirit of the statute. But it is insisted that the court should not have alluded to the matter, as it was calculated to call the attention of the jury to the failure of defendant to testify, and that that of itself would necessarily be prejudicial to defendant. We are cited to Hunt's case, *ante*, 149, wherein in quoting from an Illinois case the language used is, "and in such case court and counsel should studiously avoid all allusions to the subject." Baker v. The People, 105 Ill., 452. Our statute does not prohibit the court from alluding to the subject—it is counsel who are expressly inhibited from alluding to or commenting upon defendant's failure to testify. The court is not inhibited from alluding to and explaining defendant's rights in the matter. It may or may not prove injurious or prejudicial for the court to allude to the matter—is impossible for us to tell. In another murder case, pending at this time before us, it is complained that the court erred in refusing a special requested instruction defining the law with regard to the evidence of a defendant who had testified. We think it a matter entirely discretionary with the court whether it will instruct the jury at all as to a defendant's rights as a witness in his own case.

In Vermont it seems that the court is bound to instruct the jury that

they could not consider defendant's omission to testify in his own behalf against him.    State v. Cameron, 40 Vt., 556.

In this instance the charge complained of was unquestionably in conformity with the statute, and we can not see that it was calculated to prejudice the defendant.    Being a correct enunciation of the law, we will not presume that the court in giving it abused its discretion, nor that it was in any manner injurious to defendant.

We have discussed all the questions raised in the case.    For error in the admission of evidence as above pointed out, the judgment is reversed and cause remanded.

*Reversed and remanded.*

Hurt, J., absent.