MELVIN JOHNSON v. THE STATE.

No. 7512.   Decided April 4, 1923.

Rehearing denied June 29, 1923.

1.—Murder—Continuance—Want of Diligence.

Where the application failed to state that the witness was present at the former term of court in obedience to the process served, and states no facts which would excuse the exercise of further diligence to secure his attendance, same was properly overruled.

2.—Same—Evidence—Declaration of Third Party—Husband and Wife.

Where objection was urged to the single statement made by the State's witness to defendant, towit: "Julia said you drew a gun on her," on the ground that it was hearsay, and in effect was using the wife against defendant, held, that as the witness was relating a conversation between her and defendant, and repeated to defendant his wife's statement in response to a direct question from him as to what was the matter, and the whole tragedy was one continuous transaction, the testimony becomes admissible as res gestae. Following Bibb v. State, 83 Texas Crim. Rep., 616.

3.—Same—Rehearing—Res Gestae—Rule Stated.

Res gestae declarations may precede, accompany or follow the transaction to which they relate, but it is only when they are wrought up into and emenate from it that they can be rightfully admitted as res gestae, and the testimony in the instant case was admissible.

4.—Same—Second Rehearing—Statement in Original Opinion.

Where the motion for rehearing contended that the original opinion stated the wife of defendant was killed, and it does not appear clearly whether she was or not, the opinion is properly amended. but this does not affect the final decision.

5.—Same—Rehearing Denied—Practice on Appeal.

A re-reading of the testimony confirms this court in the view that the proper disposition has been made of the case in the original opinion, and a rehearing is denied.

Appeal from the District Court of Liberty.   Tried below before the Honorable J. L. Manry.

Appeal from a conviction of murder; penalty, death.

The opinion states the case.

*Stevens & Love,* for appellant.

*R. G. Storey,* Assistant Attorney General, for the State.

HAWKINS, JUDGE.—Appellant was convicted for the murder of Lucinda Daniels, and the death penalty awarded.

No complaint is made of the court's charge, and no special in-structions were requested. An application for continuance was sought, based upon the absence of two witnesses, White and Williams, White appeared and testified. The application recites that process was issued for Williams on the 11th day of April, 1922, and was served on May 10, 1922. The term of court at which the trial was had convened on August 7th, 1922. From this we know the process for the witness was for a former term. The application fails to state that the witness was present at the former term in obedience to the process served on May 10th, and states no facts which would excuse the exercise of further diligence to secure his attendance at the instant trial. Brittain v. State, 40 S. W. Rep., 297; Hamilton v. State, 74 Texas Crim. Rep., 219, 168 S. W. Rep., 537. The burden is on appellant to establish the exercise of diligence in support of an application for continuance. (See Branch's Ann. P. C., Sec. 314, page 186 for authorities.) The diligence is not sufficient if only a sub-poena was applied for when the law authorized an attachment. The court was justified in refusing the continuance.

Appellant and his wife, (Julia,) Tenie Mitchell and her husband, occupied the same house, but different rooms. Lettie, a sister of Tenie, lived in an adjoining house in the same yard. The deceased, Lucinda Daniels, was Julia's aunt, and Tenie's sister. All parties were negroes. The killing occurred on Monday morning. Upon one statement of Tenie Mitchell, admitted over objection, is the only other bill of exception based.

She testified that on Sunday night no one was at her house except her husband, herself, Julia and appellant; that appellant had gone to bed before witness did; that some time during the night appellant called witness and asked where his wife, Julia, was; that witness told him she was over at Lettie's; that appellant asked witness to go tell her to come home, to which she replied that she could not go as she was undressed, but told appellant to go, and he replied "All right." Witness then went back to bed. The record does not show when Julia went to Lettie's or how the witness knew she was there. If any disturbance occurred between appellant and his wife at the house during the night witness was not aware of it. The next she saw of appellant was early Monday morning. She had sent Julia after some soap and washing powders and appellant was near the fence as Julia went after the articles. When she returned she came in back of Lettie's house and called the witness, who at that time did not see appellant. Julia came on and went in the house. She was crying at the time and witness went in to see what she wanted. When witness came out she met appellant who had a shot-gun with him. Julia had not been in the house more than a minute. As witness came out appellant asked her what was the mat-

ter, to which witness replied, "Julia said you drew a gun on her," whereupon appellant said, "Oh, I didn't, I came back down here because I knew Julia was coming back down here and tell some stories on me." Witness then said to appellant: "I didn't think you would draw a gun on Julia," to which he replied, "No, I wouldn't hurt my wife for nothing," and said he would talk to Julia and went in the house. A few minutes later Julia came out to where witness was washing and said she was going to Mrs. Grogan's, and started away. Appellant started off with his gun; when Julia saw him she turned and came back to witness. Appellant also came back and the three of them went in the house. Witness had some conversation with appellant. He finally said he wanted Julia to get his brass knucks. Witness told Julia to give him the knucks if she could find them, and all three of them seem to have instituted a search for the missing knucks. Witness says it was not long after this until the shooting took place; that after the brass knucks could not be found she went after Reverend Washington to get him to talk to appellant and his wife, and that while she was away the shooting occurred; she did not see it but heard the reports. Other evidence shows that appellant's wife came out the front door of the house, and appellant was following her and shot her in the back of the head, then fired another shot at her after she had fallen; that he reloaded his gun and went out the gate on to a little "tram road" and started away when Lucinda came running toward the house wringing her hands, and asked what was the matter. Appellant turned, went back to meet Lucinda and threw the gun on her. She was seen by witnesses to throw her hands above her head, they being in this position when he fired at her, the shot striking her in the face, from the effects of which she immediately died.

Appellant's story about the transaction was that after he had gone to bed on Sunday night four women came in and tried to kill him, and that he jumped out of the window and ran off; that Lucinda Daniels had a pistol and two of the others had knives; that the reason he shot his wife was because she was trying to kill him with the same shot gun that he shot her with, and that when Lucinda Daniels came up she had her hands upon her apron and he thought she was going to shoot him was the reason he killed her. Objection is urged to the single statement made by Tenie to appellant, viz:— "Julia said you drew a gun on her," on the ground that it was hearsay, and in effect was using the wife as a witness against appellant. Witness was relating a conversation between her and appellant, and repeated to him Julia's statement in response to a direct question from him inquiring "what was the matter." Nothing was wrong with the witness, therefore the inquiry could not have been with reference to her. Appellant's wife was crying, and evidently had just told witness in the house that appellant had drawn a gun

on her, and what she had said was communicated to appellant when he was approaching the house with a gun in his possession. Julia was not called as a witness; indeed, could not be under the law,, appellant being on trial not for shooting her, but for killing Lucinda; but the shooting of the one and killing the other were so related as to be practically one transaction. It was not possible to develop the facts relating to Lucinda's death without also showing the shooting of Julia. While the wife- may not be called by the state as a witness in the prosecution of her husband for killing another yet statements made by her become admissible when shown by other witnesses if *res gestae.* As said by Judge Morrow in Bibb v. State, 83 Tex. Cr. Rep., 616, 205 S. W. Rep., 135:

"It is not her testimony that is used, but her verbal act so connected with the transaction as to become a part of it, and provable by competent witnesses like any other part of the transaction. See Robbins v. State, 73 Tex. Cr. Rep., 367, 166 S. W. Rep., 528; Cook v. State, 22 Tex. Crim. App., 511, 3 S. W. 749, Wharton's Crim. Ev. Sections 252, 253."

(The citation to Wharton is an error. It should be Sections 262, 263.) See to the same effect the later case of Gilmore v. State, 91 Tex. Crim. Rep., 31, 241 S. W. Rep., 492. We quote from Section 262, Wharton's Crim. Evidence:—

"So long as the transaction continues, so long do acts and deeds emanating from it become part of it, so that in describing it in a court of justice they can be detailed. The distinguishing question is, Is the evidence offered that of the event speaking through the participants? If so, what was thus said can be introduced without calling those who said it. Is the evidence offered that of observers speaking about the event? If so, such observers must be called to testify.

Nor are there any limits of time within which the res gestae can be arbitrarily confined. They vary in fact with each particular case."

Unless we misapprehend the record the transaction which culminated in the death of Lucinda and the shooting of appellant's wife had begun when Julia returned to the house crying; it was practically continuous from that time until the killing resulted.

"There is no limit of time in which the res gestae are arbitrarily confined. They vary with each particular case. They need not be coincident as to time if they are joined by the existing feeling which exists without break or let-down, from the moment of the event they elicit. If the acts and declarations appear to spring out of the transaction, if they elucidate it, if they are voluntary and spontaneous, and if they are made at a time so near it as reasonably to preclude the idea of deliberate design, then they are to be regarded as contemporaneous, and are admissible."

The foregoing statement from Branch's Ann. P. C., Sec. 83, p. 53, epitomizes the rule, and is in consonance with Wharton (supra) and is supported by the many cases collated, notably McGee v. State, 31 Tex. Cr. Rep., 74, 19 S. W. Rep., 764; Bronson v. State, 59 Tex. Cr. Rep., 17, 127 S. W. Rep., 177; Lewis v. State, 29 Tex. Cr. Rep., 204, 15 S. W. Rep., 642; Craig v State, 30 Texas. Cr. Rep., 621, 18 S. W. Rep., 297. As we view the record the statement objected to was a part of the transaction, grew out of it, and was a spontaneous verbal act of appellant's wife incident thereto.

If, perchance, we have misapplied the rule, then it is inconceivable to us how even the erroneous admission of the statement complained of could have injuriously affected appellant under the facts shown by the record. Within a short time after he was told that his wife claimed he had drawn a gun on her, he shot her in the back of the head, and immediately thereafter killed her aunt. The punishment fixed by the jury is the severest known to the law, but we cannot say it is unmerited.

The judgment is affirmed.

*Affirmed.*

ON REHEARING.

June 20, 1923.

MORROW, Presiding Judge.—Appellant's counsel insists that at the time the original opinion was written the evidence was misinterrupted. It is his position that that part of the conversation between the witness Tenie Mitchell and the appellant in which appellant asked her "what was the matter" and she replied that "Julia said that he had drawn a gun on her" was so disconnected from the homicide upon which the prosecution is based as to bring it within the hearsay rule. With this in mind, we have carefully reviewed the statement of facts.

Appellant shot his wife Julia and a few minutes later killed Lucinda Daniels. The conviction is for the latter homicide. He was a young man and had been married but two years. Lucinda Daniels was the aunt of appellant's wife. In his testimony he sought to justify the homicide. He said that on the night preceding the homicide, he was attacked by four persons. The deceased was one of them. She had a pistol; two of the others had knives. He killed her the first time he saw her thereafter. He was going out of the gate when she called him to stop, cursed him and approached him over his protest. She had her hands under her apron and he thought she had a weapon and intended to kill him. He fired in order to protect his life. He said that he had a gun for the purpose of hunting some birds; that it was lying on the table; that his wife got possession of it and attempted to shoot him. He took the gun away from

her and shot her. This too, was in self-defense, according to his theory. The killing was described by eyewitnesses thus: Appellant and his wife came from around the house, going in the direction of the fence. His wife was going fast. Appellant raised his gun and shot her. She fell, after which he shot her again. His .wife's aunt, Lucinda Daniels, came out of the gate and started down the track, running and slapping her hands. He saw her and turned to meet her. She approached him with her hands raised. The gun fired and she fell. The witness Tenie Mitchell, who with her husband, lived in the same house as did the appellant and his wife, testified that after she and her husband had retired, appellant aroused them looking for his wife. The next morning he was seen by this witness at his home with a gun in his possession. The wife had gone on an errand, and upon her return, went to the store again. Appellant went to the home of his aunt. Later both of them returned. The wife was crying. The witness had a conversation with her; also with the appellant. In the conversation with the witness, he asked her "what was the matter" and she told him that "Julia said that he had drawn a gun on her." His reply is set out in the original opinion.

The witnesses were negroes. The testimony is only partially in narrative form. It is our understanding of it that the two women were shot within a few moments of each other and that from the time the appellant first appeared at his home, not more than half an hour elapsed until the deceased was killed.

We held in the original opinion that the conversation in question was exempted from the hearsay rule because it was res gestae. Res gestae declarations may precede, accompany, or follow the transaction to which they relate, but it is only when they are wrought up into and emanate from it that they can be rightfully admitted as *res gestae.* Wharton's Crim. Ev., Vol. 1, p. 502. Apparently the testimony in question comes within this principle, and to our mind, its admission is justified by another rule of evidence. Appellant claimed that both women were shot in self-defense. From the testimony, it is to be inferred that according to his theory, they both attacked him upon the night before. But a few moments intervened between the shots that wounded both his wife and killed her aunt. The state of mind at the time he shot the deceased, Lucinda Daniels, was a proper subject of inquiry. The conversation with Tenie Mitchell was one of the means available to the State to enable the jury to determine the state of mind of the appellant in order that they might determine his guilt or classify the grade of the offense. The facts and circumstances immediately attending the homicide were admissible in evidence. Cyc. of Law & Proc., p. 889, note 42 and cases cited. In the instant case, this included all that took place after appellant arrived on the scene of the homicide up to the time

that he killed the deceased and would embrace all conversations touching the parties to the transactions in which he engaged. The transactions are so interwoven that the facts pertaining to one cannot be segregated from the other.

The motion is overruled.

*Overruled.*

### SECOND MOTION FOR REHEARING.

### June 29, 1923.

MORROW, PRESIDING JUDGE.—In an application to reopen the case, appellant directs attention to the fact that it was stated in the opinion on motion for rehearing that Julia, the wife of the appellant, was killed. In his motion he says that she was not killed. The statement of facts shows that she was shot and leaves the impression that she was killed. However, whether she was killed or not is unimportant. The conviction is for the killing of Lucinda Daniels, the aunt of appellant's wife.

The opinion has been amended to show that within a few minutes, appellant shot Julia, his wife, and shot and killed Lucinda Daniels, her aunt. The position taken in the application under consideration that we were mistaken in stating that a few minutes elapsed between the two shots is not in accord with our understanding of the record. It is true that the beginning of the quarrel with his wife, as observed by the witness Tenie Mitchell, was about thirty minutes before the death of the deceased. From his arrival on the premises until the time he shot his wife, they were in conversation with each other. He was in possession of a gun. He protested that he had no intent to injure her. One time during the interval, according to the witness Mitchell, he was laughing and talking to the witness and said he wanted his wife to get his brass knucks; that she had mislaid them. We quote from the testimony of the witness Mitchell upon the subject:

"I said, 'Julia, why don't you get his brass knucks and give them to him if you can find them.' He said she mislaid them, she can't find them. I said if they are in here I will help her find them and we went to hunting them.

It wasn't long after that until the shooting took place. After I couldn't find the brass knucks I went out of the house and left there and went to the wash place. I thought maybe somebody else could talk to them and I went and got Reverend Washington to talk to them, and while I was gone, he shot her."

After going after the Reverend Washington to talk to them, the witness returned in a few moments and found that both the wife and the aunt had been shot. The witness estimates the intervening time at five minutes.

From the testimony of Burton, one of the eyewitnesses, these excerpts are quoted:

"I was there the day of the shooting and I saw a part of it. The part of it that I saw was, I seen when the young man shot his wife and I seen the young man and young lady come out—she was going over seemingly to the corner of the fence. . . . When I seen them they were going to the corner of the fence and I seen the young man when he raised his gun and shot; he was shooting°at his wife; at that time she was going from him; she was going pretty fast but I couldn't say she was running or walking.

I saw him raise his gun and shoot her; he shot at her twice but I couldn't say he hit her; he shot at her after she fell. . . . Then when she fell down it seemed to me he broke his gun—I do not know whether he put a shell in or not—then he turned and came out of the yard, . . . and started down the track towards the boarding-house about two rail lengths and looked back and saw this other woman coming down the track towards the quarters.

When I seen her coming she was running seemed like, she was slapping her hands together like that (witness indicating).

When he seen her he turned to meet her and went about a rail and a half length of her, he raised his gun to shoot at her; she raised her hands and the gun fired about the time she reached the gate. Yes, sir, the gun fired. She fell then and he turned and went back down the track going towards the boarding-house."

A re-reading of the testimony confirms us in the view that the proper disposition has been made of the case, as indicated in the opinions heretofore rendered.

The motion is denied.

*Rehearing denied.*