# CHARLIE OUTLAW v. THE STATE.

No. 16488. Delivered February 21, 1934.
Rehearing Denied March 21, 1934.
Reported in 69 S W. (2d) 120.

The opinion states the case.

*James W. Peavy* and *Jack U. Scarborough,* both of Lufkin, for appellant.

*Lloyd W. Davidson,* State's Attorney, of Austin, for the State.

CHRISTIAN, JUDGE.—The offense is murder; the punishment, death.

It was charged in the indictment, in substance, that appellant, with malice aforethought, killed Mrs. Frank McCall by beating, bruising and wounding her with a hammer.

Living with deceased and her husband was their young daughter and the mother of deceased, who was approximately eighty years of age. Appellants' home was nearby. The relations between appellant and the family of deceased had apparently been friendly, they having been neighbors for some time. Shortly prior to the homicide deceased had sold a bale of cotton and had received in cash approximately fifteen dollars, which she had taken to her home. Mr. Shofner, the party who negotiated the sale, testified that appellant asked him how much money deceased had received. On the 24th of January, 1933, between three and four o'clock in the morning, deceased, her husband, mother and young daughter were assaulted in their home and severely beaten with a hammer, and the money of deceased taken. According to the testimony of the mother and daughter of deceased, appellant came to their home between 3.

and 4 o'clock in the morning and called deceased, saying that he had the toothache and had come over to get some medicine. Upon being invited into the house, he asked for a cup of coffee, and deceased made him some coffee. He then asked deceased for ten dollars, and she replied that she was unable to let him have that amount of money. He finally requested that deceased let him have two dollars and a half, saying that he wanted the money for the purpose of hiring a truck and buying groceries. Deceased acceded to the last request, and was preparing to give the money to appellant when he struck her several blows with a hammer, inflicting upon her head the fatal wounds. Deceased said: "Oh, you have killed me." Appellant replied: "I intend to kill you." Appellant then attacked the husband of deceased in the same manner. Holding a pistol in his left hand, he went into the room occupied by deceased's mother and daughter and attacked them with the hammer, severely beating and injuring them. Deceased crawled to a neighbor's house and cried out for help. Responding to her call, the neighbor found her lying on the ground with blood all around her. He testified: "Her head was bloody and her hair like wire—stiff with cold blood. * * * She was still bleeding and the ground around there where she was was covered with blood and it was yet dark, and she was out there calling for help." Witnesses going to the home of deceased found that all of the occupants of the house had been attacked. They were bloody and there was blood in numerous places in the house, the evidence indicating that none of those present was in a condition to help himself. Deceased died shortly after the assault. Appellant fled to the State of Arkansas where he was eventually apprehended. On the night of the homicide appellant had told a witness, according to his (the witness') version, that he had no money. Immediately after the homicide, and while he was fleeing to the State of Arkansas, appellant stopped at some houses in the country and, exhibiting money, offered to pay for food. One witness testified that appellant had a number of silver halves in his hand.

Testifying in his own behalf, appellant denied that he went to the home of deceased on the occasion in question. He further testified that a number of his relatives had become insane. Touching his action in going to the State of Arkansas, he testified that he had been advised that a mob was looking for him.

As shown by bill of exception No. 2, appellant predicated a motion to quash the indictment on the ground that two members of the grand jury returning the indictment had failed to pay a poll tax. The bill of exception fails to show that the grand jurors in question were subject to the payment of a poll

tax, and notwithstanding the order of the court in overruling the motion recites that evidence was heard, there is an entire absence of any proof in the record that they were subject to the payment of such tax. It appears to be appellant's position that in making proof of the fact that the grand jurors had not paid a poll tax he discharged the burden of establishing the disqualification of said grand jurors. Under the statute persons over sixty years of age are entitled to vote without being required to pay a poll tax. See article 2959, Revised Civil Statutes, 1925. It is not contended that the grand jurors were otherwise disqualified to serve. As far as the record reflects the matter, they might not have been subject to the payment of a poll tax. Under the circumstances, this court must presume that the trial court found such grand jurors to be qualified voters before he impaneled them. Stewart v. State, 58 S. W. (2d) 519. It is unnecessary to decide whether one under sixty years of age is disqualified to serve as a grand juror in the absence of the payment of a poll tax.

An application for a change of venue on the alleged existence of prejudice was in due time filed and presented to the trial court. The means of knowledge of the compurgators was controverted. Appellant, as well as the state, introduced evidence. Several witnesses called by appellant expressed the opinion that he could obtain a fair and impartial trial in Angelina County. They entertained the view, based on the discussion they had heard, that generally there was no prejudice against appellant. Other witnesses introduced by appellant were of the opinion that his case had been prejudged, and that there was prejudice against him in various parts of the county. A number of the witnesses who entertained the latter view based their conclusion upon the discussion they had heard in their respective communities. Some of them testified that the opinions expressed by those talking to them had been unfavorable to appellant; while others testified that the sentiment of those to whom they had talked appeared to be divided. Most of appellant's witnesses failed to show the extent to which they had heard the case discussed. Some of them testified that they had not talked to many people. Others testified that they had heard the opinion expressed that if appellant was guilty he should be electrocuted. One witness said he had talked to fifty people. The witnesses for the state were generally of the opinion that appellant could obtain a fair and impartial trial. Some of them stated, however, that they believed that people would be prejudiced against the character of crime involved. They were of the opinion, from their discussion of the case with others, that there

was no prejudice against appellant. Some of these witnesses testified that the people they had talked to did not know the facts of the case. One of the witnesses for the state testified that of the people he had heard discuss the case, many entertained no opinion as to the guilt or innocence of appellant. This witness was the tax assessor of the county. The newspaper articles introduced by appellant carried accounts showing the commission of the offense, the circumstances surrounding its commission, and the fact that appellant had fled, and was at large. Other accounts showed the apprehension of appellant and his statement that he was innocent. Some of the accounts stated that appellant had at one time been a postmaster in the county and had served a term in the penitentiary. In one of the accounts it was stated that there was a demand throughout the county that there be a speedy trial. Further, it was stated in some of these articles that the offense committed was one of the most terrible crimes occurring within the confines of the county. Generally speaking, the daily paper published at Lufkin was not widely circulated in the county at large. On the other hand, a weekly paper, which also carried accounts of the transaction, was largely circulated in sections of the county away from Lufkin. The record fails to show that there was any difficulty in securing a jury. Whether appellant exercised a single peremptory challenge is not shown; and whether any of the venire disqualified because they entertained an opinion as to appellant's guilt or innocence is not disclosed. Whether a single member of the venire read the reports embraced in the newspapers is not shown. No character of misconduct on the part of the jury is sustained in the record.

From the case of McNeely v. State, 104 Texas Crim. Rep., 267, 283 S. W., 524, the following quotation is taken:

"Touching the duty of the trial court and of this court upon an application for change of venue, the law, as deduced from the statutes and the decisions, is, as we understand, that where the application is upon the ground of prejudice, and is controverted, the burden is upon the accused to prove the existence of such prejudice against him or against his case that it is not probable that he can have a fair and impartial trial.

"The duty is upon the trial court to weigh the evidence, and if therefrom there arises conflicting theories, one tending to show prejudice of the nature mentioned and the other the contrary, the discretion as to the court is to adopt either. In the absence of abuse of this discretion, the judgment is not to be disturbed upon appeal. If, however, the evidence is such that it leads to the conclusion that bias, prejudice, or prejudgment

of appellant or his case is such as to render it improbable that a fair and impartial trial can be given him, the trial court is without discretion to refuse the application."

The inference of prejudice requiring a change of venue is not to be drawn from the fact alone that newspapers published in the vicinity have contained news articles descriptive of the offense or editorials denunciatory of the accused. Cox v. State, 234 S. W., 72; McKenzie v. State, 11 S. W. (2d) 172. However, there have been instances in which the acts of one accused of crime have been the subject of public controversy in which newspapers have taken part to a degree that has rendered the publications important factors in creating a prejudice against the accused. In those cases the publications went beyond the point of giving the news of the day and took part in the controversy to a degree that rendered it improbable under the circumstances that an impartial trial could be had. See Fleming v. State, 139 S. W., 598; Gallaher v. State, 50 S. W., 388; Cox v. State, supra.

It is observed that Angelina County has a population of more than 27,000. The city of Lufkin, near which the homicide occurred, has a population of approximately 8,000. On the question of prejudice, it is thought the testimony of appellant's witnesses fails to show that they had heard the case discussed to such an extent as would warrant their opinion that there was in existence in the county such prejudice against appellant as would preclude him from obtaining a fair and impartial trial. Most of these witnesses had not heard the case generally discussed. They had talked to comparatively few people. Their testimony was controverted, not only by witnesses produced by the state, but by several witnesses called by appellant. Thus, from the testimony heard, conflicting theories as to prejudice arose. This being the case, the trial court had the discretion of adopting either theory. It was his duty to weigh the evidence. Under the circumstances, we are constrained to hold that the trial judge did not abuse the discretion which the law vested in him, and that this court is without legal authority to enter a judgment declaring that in refusing to change the venue there was an abuse of discretion.

Bill of exception No. 3 recites that appellant, in examining the first juror on his voir dire, propounded to him the following question: "Have you paid your poll tax for the year 1932?" The objection of the district attorney that the question was immaterial was sustained, and the court instructed appellant's counsel not to repeat the question to other jurors. Conceding that the trial judge should have permitted the question,

it is observed that it is not shown that appellant was injured as a result of the alleged error. The bill fails to show that any juror sat upon the trial who had not paid a poll tax. Certainly this could have been shown if in fact it occurred. See Naugle v. State, 40 S. W. (2d) 92. Let us assume that some of the jurors answered that they had not paid a poll tax, and appellant's challenge for cause had been overruled and he had exercised peremptory challenges. Under such circumstances, unless it was shown that objectionable jurors had been forced upon him, injury would not be manifested. King v. State, 100 S. W., 387; Hash v. State, 286 S. W., 1102.

Bills of exception Nos. 4 and 5 relate to the action of the trial court in permitting Mrs. Mary Looney and Sallie McCall to testify that after appellant struck deceased with the hammer he attacked the other occupants of the house in the same manner. That the killing of deceased and the attack upon her husband and the other occupants of the house grew out of the same transaction and were practically contemporaneous is clearly shown by the evidence. This proof was within the rule of res gestae. Claxton v. State, 4 S. W. (2d) 542. Underhill on Criminal Evidence, 3rd Ed., sec. 152, lays down the rule applicable here as follows:

"If several crimes are intermixed, or blended with one another, or connected so that they form an indivisible criminal transaction, and full proof by testimony, either direct or circumstantial, of any one of them cannot be given without showing the others, evidence of any or all of them is admissible against a defendant on trial for any offense which is itself a detail of the whole criminal scheme."

Bills of exception 7 and 8 relate to the action of the trial court in permitting witnesses who went to the scene of the homicide to testify in detail as to the condition in which they found the occupants of the house. We think this testimony was admissible as shedding light on the transaction.

Bill of exception No. 6 recites that W. L. Shofner testified that he went to the point where deceased was and found her down on her hands and knees; that she was covered with blood; that her limbs were bloody and her hands almost torn to pieces; that she had crawled approximately a quarter of a mile on her hands and knees; that she showed evidence of suffering; that the ground around her was covered with blood; that she was out there calling for help; that she stated to him that Charlie Outlaw (appellant) had attacked her with a hammer; that she said he had nearly killed her and had killed her husband. The bill of exception begins by setting out the testimony of the witness

as above detailed. It concludes with appellant's objections and recites that they were overruled and that appellant excepted. As presented, the bill fails to show the surrounding facts. In order that the complaint that the declaration was not res gestae can demand attention, the bill should reveal the facts from which the reviewing court could decide that the evidence did not come within the rule. Cavanar v. State, 269 S. W., 1053. This the bill under consideration fails to do. If, in view of the extreme penalty, the statement of facts be considered in aid of the bill, we think no error was committed in receiving the testimony · in question. According to the witnesses, the assault occurred between 4 and 5 o'clock in the morning at the home of deceased. Each occupant of the house was assaulted in the same manner as was deceased. The home of deceased was about four hundred yards from that of the witness Shofner. The witness mentioned testified that he got up about 4 o'clock in the morning of the attack and had just built a fire when he heard deceased calling. The record excludes the idea that deceased had conversed with any person prior to the time she made the statement to the witness Shofner. We think it further shows that between the time of the assault and that of the declaration she had not been in a condition for reflection. Moreover, while the record is indefinite as to the length of time that had transpired between the assault and the making of the declaration, we think it is fairly inferable that it was not over forty minutes. That deceased was undergoing terrible physical suffering was obvious. She had been beaten over the head with a hammer, and, according to the testimony of the attending physician, her skull was fractured to the extent that the brain substance could be seen. At the time the witness Shofner went to her, she had been crying for help. All of the circumstances, in our opinion, bring the transaction within the rule of res gestae as interpreted by the precedents in this state.

We quote from Branch's Annotated Penal Code, sec. 83, page 53, as follows: "There is no limit of time in which the res gestae are arbitrarily confined. They vary with each particular case. They need not be coincident as to time if they are joined by the existing feeling which exists without break or let-down, from the moment of the event they elicit."

The foregoing rule has been approved by this court in numerous decisions. See Johnson v. State, 252 S. W., 554, and authorities cited. Illustrating the point that there is no limit of time in which the res gestae is arbitrarily confined, in Lewis v. State, 29 Texas App., 201, 15 S. W., 642, the statements of the deceased were made from half an hour to an hour and a

half after the difficulty, and were held admissible as res gestae. In Fulcher's Case, 28 Texas App., 465, 13 S. W., 750, a statement by the deceased made thirty minutes after the difficulty was held admissible. See, also, Bell v. State, 224 S. W., 1108. In Freeman v. State, 46 S. W., 641, statements made by the deceased from thirty minutes to an hour after the difficulty were held to be admissible as res gestae. In the case last mentioned the court said:

"The main question is, does it appear from all the circumstances that the statement was spontaneous, and sprang out of and was a part of the transaction itself? If so, the testimony is admissible, though the statement may not have been made exactly contemporaneous in point of time with the wound inflicted. But in all such cases it must appear that the statement or declaration was spontaneous, and sprang out of and was a part of the transaction." See, also, Vargas v. State, 298 S. W., 591.

Several bills of exception deal with argument of the district attorney. We deem it unnecessary to enter into a detailed discussion of these bills. They have been appraised in the light of the facts and surroundings of the case. Under the circumstances reflected by the record, the remarks embraced in the bills are not thought to present reversible error. See Silver v. State, 8 S. W. (2d) 144; Vineyard v. State, 257 S. W., 548.

The judgment is affirmed.

*Affirmed.*

The foregoing opinion of the Commission of Appeals has been examined by the Judges of the Court of Criminal Appeals and approved by the Court.

### ON MOTION FOR REHEARING.

LATTIMORE, JUDGE.—Appellant again presents the point that the venue of this case should have been changed, and that refusal to so order reflected an abuse of the discretion of the trial court. Appellant put eighteen witnesses on the stand, nine of whom expressed the opinion that appellant could get a fair and impartial trial in Angelina county; some of the others saying that they had talked to only a few people, and still others professing to know nothing of the condition outside of their own immediate locality. The state put on five witnesses, all of whom expressed the opinion that a fair and impartial jury could be obtained in said county, and that appellant could get a fair trial therein. The testimony of all these witnesses together with the articles published in the newspapers of said

county regarding this case, as they appear in the record, have all been again carefully reviewed, having regard to the severity of the penalty, but without causing us to change our conclusion that there appears no abuse of the discretion of the trial court in the matter under discussion. As said in our original opinion, there seems to have been no trouble in getting a jury, and if more than one venire was used, that fact is not shown. Nor does there seem complaint that any unfair or prejudiced juror sat in the case, or that anything transpired in the jury room evidencing the presence of prejudice or prejudgment on the part of any juror.

We see no need for discussing the point again raised, that the court below erred in not letting appellant's attorneys ask each juror whether he had paid his poll tax. Article 579, C. C. P., specifically provides that failure to pay poll tax shall not disqualify any person from jury service.

Those bills of exception complaining of the argument of state's counsel have also been reviewed, and none of them are deemed to present statements of such character as to call for a reversal. Without setting any of them out further, it would appear that probably the most serious complaint could be leveled at that argument in which the jury were told by state's counsel that "All the old women of Angelina County between the ages of 60 and 80 have their eyes on you and are anxiously awaiting your verdict in this case, and the state will not be satisfied with any verdict less than the death penalty." There is nothing in the bill to show that there were any women in the court room between the ages of 60 and 80 years, or to raise the probability that such argument would create in the minds of the jury any belief that same was a fact based on anything tangible which might affect or influence the jury. The concluding part of said argument so objected to, i.e., that the state would not be satisfied with any penalty less than death, was not made to depend upon the anxiety of the aged women of the county, and certainly can not be regarded as improper argument.

Not being able to agree with any of the contentions of appellant, the motion for rehearing will be overruled.

*Overruled.*