SAMPEY PARKER v. THE STATE.

No. 11603. Delivered December 19, 1928.

▮▮▮

▮▮▮▮▮

▮▮▮▮▮

The opinion states the case.

*Everett Bryson* of Pittsburg and *J. A. Ward* of Mt. Pleasant, for appellant. On right to change of venue, appellant cites: Gallaher v. State, 50 S. W. 388; Cortez v. State, 698 S. W. 536; Sorrels v. State, 169 S. W. 299; Stoball v. State, 250 S. W. 177; Dobbs v. State, 163 S. W. 919; Coffman v. State, 136 S. W. 779; Cox v. State, 234 S. W. 72; Fenks v. State, 209 S. W. 155.

*A. A. Dawson* of Canton, State's Attorney, for the State.

CHRISTIAN, JUDGE.—The offense is assault with intent to murder; the punishment confinement in the penitentiary for two years.

The sheriff of Camp County was the injured party. He was sitting in the lower story of the jail at night talking to a deputy sheriff when someone fired at him from without with a shotgun. The state relied upon circumstantial evidence to connect appellant with the offense. The circumstances, if believed, were sufficient to support the conclusion that appellant and one Perrin Cotter were the guilty parties. There was testimony to the effect that appellant and Cotter had threatened to kill the sheriff and that they had entered into a conspiracy for the purpose of carrying into effect their unlawful design. The state proved that the sheriff had been watching the movements of appellant and Cotter, and that on one occasion in placing appellant in jail he struck appellant with a pistol. There was testimony to the effect that appellant stated that he would "get even" with the sheriff. The sheriff suffered minor injuries. Appellant and his witnesses placed appellant at another and different place at the time the offense was committed.

Appellant filed an application for a change of venue, wherein prejudice and a dangerous combination instigated by influential citizens were claimed to preclude the probability of a fair and impartial trial being accorded him. Upon the issue being joined, many witnesses were brought forward by each side.

It was undisputed that the sheriff was a very popular and influential citizen of the county, and that his efforts to enforce the law had met with the approbation of the good citizenship. When it became known that an attempt upon the life of the sheriff had been

made, some of the citizens of Pittsburg, the largest town and principal trading point in the county, called an "indignation mass meeting," which was attended by six or eight hundred people from various portions of the county, all parts of the county being represented. The meeting was held August 8, 1927, the day after the attempt was made to assassinate the sheriff. Several prominent and influential citizens addressed the meeting, among them being the county judge. Appellant had not been arrested and not being known as the sheriff's assailant, his name was not mentioned at the meeting. One speaker stated that "the time ought to be just short enough to find the first limb." The speeches were received with enthusiasm. Resolutions were passed pledging the citizenship to support all of their elected officers and recommending that a reward be offered for the arrest and conviction of the perpetrator of the deed. Sixty-seven citizens donated a fund of $644.50 to be used as a reward for the arrest and conviction of the offender. Among the subscribers were bankers, business men, officers and the Ku Klux Klan. The Pittsburg Gazette, the only newspaper published in the county, carried an account of the meeting in which reference was made to the statements made by the prominent speakers of the occasion. An account of the shooting was also carried in the same paper, and attention was called to the fact that the sheriff had been untiring in his efforts to break up violations of the liquor law. It was stated in said articles that the supposition was strong that the cowardly attack on his life had resulted from his activities in the direction mentioned, and that the news of the attempted assassination, which had spread throughout the county, had been quick to arouse indignation and resentment which had crystallized into the mass meeting referred to. Appellant was arrested on the following day and allowed bond in the sum of $2,000.00, which was furnished. Upon being bound over, the bond was increased to $3,000.00. Upon a hearing, appellant was placed under a bond to keep the peace in the sum of $5,000.00. The Gazette carried an account of the arrest of appellant and the amount of bond required, but did not report the testimony heard upon the examining trial. Camp County had approximately two thousand qualified voters, approximately one-third of which were negroes. The Gazette had a circulation in the county of about twelve hundred. In area there are only two smaller counties in the state than Camp County. It is thirteen miles from the north line to the south line of the county and about sixteen miles from the east line to the west

line. The county had a population of a little more than eleven thousand. At the examining trial "there were as many people here as the court room would hold—the aisle was packed and on each side of the aisle they were just as thick as could be." Only the state offered testimony upon the examining trial. Appellant had great difficulty in making bond. The mayor of Pittsburg was criticized by several people for signing appellant's bond. Appellant was indicted September 24, 1927, and tried October 15, 1927, approximately two months after the offense was committed. The case had been generally discussed by the people of the county.

Turning from the above facts, which seem to have been undisputed, we find that some thirty witnesses testified that appellant in their opinion would be unable to obtain a fair and impartial trial on account of prejudice against him and his case. Twenty-eight witnesses for the state controverted the existence of prejudice against appellant and expressed the view that he could obtain a fair and impartial trial. Several of these witnesses entertained the opinion that appellant was guilty. Many of them were familiar with every step that had been taken in appellant's case.

The jury lists drawn for the first, second and third weeks of the term were exhausted without securing a jury. Other jurors were summoned, the total number examined being eighty. Fifty-three jurors disqualified on account of entertaining an opinion as to the guilt or innocence of appellant, or on account of relationship to the sheriff. Appellant exhausted his peremptory challenges.

Considering the entire evidence in connection with the prominence and influence of the popular sheriff, his vigorous efforts in the direction of law enforcement, the wave of indignation that resulted from the attempt on his life, the mass meeting attended by citizens from the county at large and the publicity given thereto, the general discussion of the case and interest manifested therein, as shown by the large attendance upon the mass meeting and examining trial, we are unable to escape the conclusion that prejudgment of appellant and his case rendered it improbable that he could obtain that character of fair and impartial trial contemplated by the constitution. When the evidence is such that it leads to the conclusion that bias, prejudice, or prejudgment of appellant or his case is such as to render it improbable that a fair and impartial trial can be given him, the trial court is without discretion to refuse the application. McNeely v. State, 283 S. W. 522. Giving effect here to the rule controlling, we

must hold that the learned trial judge fell into error in refusing to change the venue.

The judgment is reversed and the cause remanded.

*Reversed and remanded.*

The foregoing opinion of the Commission of Appeals has been examined by the Judges of the Court of Criminal Appeals and approved by the Court.