## C. S. McNeely v. The State.

### No. 9514.   Delivered October 7, 1926.

### Rehearing denied May 12, 1926.

**1.—Murder—Change of Venue—Discretion of Court—No Abuse of Discretion Shown.**

Where, on a trial for murder, appellant filed a motion for a change of venue, alleging a prejudice against him in Bell County, such as would render it improbable that a fair and impartial jury could be secured in that county to try his case. Upon the hearing of his motion he introduced some thirty witnesses from various parts of the county, and the state in rebuttal introduced some forty witnesses, also from various parts of the county, who testified that a fair and impartial jury could be secured.

**2.—Same—Continued.**

Where an application for a change of venue is presented, under the statutes of this state, and the uniform decisions of this court, if the grounds set out in the application are of prejudice, and is controverted by the state, the burden is upon the accused to prove the existence of such prejudice against him, or against his case, is so great that it is not probable that he can get a fair and impartial trial.

**3.—Same—Continued.**

The duty is upon the trial court to pass upon the evidence, and if therefrom there arises conflicting theories, one tending to show prejudice and the other to the contrary, it is within the discretion of the trial court to adopt either. In the absence of abuse of this discretion the decision of the trial court is not to be disturbed on appeal. The evidence before us, as disclosed in the record, being in conflict on the issue, and this conflict having been resolved in favor of the state, nothing is disclosed to us showing an abuse of the discretion of the trial court and his refusal of a change of venue cannot be disturbed. See Carlisle v. State, 255 S. W. 991, and authorities therein collated.

**4.—Same—Evidence Sufficient—Punishment for Jury.**

Where the jury resolves conflicting evidence in favor of the state, and the evidence of the state is sufficient to support the conviction, it is within the province of the jury to fix the penalty, within the terms of the statute. Observing these principles this court cannot assent that the homicide was not committed upon malice. There was evidence of express malice. The jury has determined that the homicide was not justifiable on the ground of self-defense, nor mitigated to the degree of manslaughter, and the judgment is affirmed.

#### ON REHEARING.

**5.—Same—Change of Venue—Properly Refused.**

On rehearing appellant urges that in passing upon the refusal of the trial court to grant him a change of venue, all the evidence heard on the trial, as well as the result thereof, in connection with evidence heard in support of the application for a change of venue, should be considered by

this court, and cites several cases in support of his contention. The facts in the cases cited are so different from those disclosed by the present record, that we cannot regard them as authority applicable to this case, and our original opinion that no error is shown in the refusal of the trial court to grant a change of venue is confirmed. Distinguishing Barnes v. State, 59 S. W. 882, and other cases cited.

Appeal from the District Court of Bell County. Tried below before the Hon. Lewis H. Jones, Judge.

Appeal from a conviction of murder, penalty, life imprisonment in the penitentiary.

The opinion states the case.

*White & Culp* and *DeWitt Bowmer* of Temple, for appellant.

*Few Brewster,* District Attorney, *W. W. Hair* and *A. L. Curtis,* private prosecutors, *Sam D. Stinson,* State's Attorney, and *Robert M. Lyles,* Assistant State's Attorney, for the State.

MORROW, Presiding Judge.—Appellant was convicted of the offense of murder, and his punishment fixed at confinement in the penitentiary for life.

Appellant, using a pistol, shot and killed J. W. Nichols. He sought a change of venue upon the ground that there existed prejudice against his case such as rendered improbable that he could receive in the county a fair and impartial trial. Upon that issue the court heard the testimony of some thirty odd witnesses introduced by appellant, and about forty by the state, and in the conduct of the inquiry each of these witnesses was cross-examined at length, and their testimony is brought before this court in narrative form and covers some 200 pages of typewritten matter, all of which we have carefully read. The impracticability of rehearsing this testimony in this opinion is obvious. The appellant was a man some fifty-five years of age and had many years before the homicide married the sister of deceased, J. W. Nichols. Their unfriendly relations began some few years antecedent to the homicide and grew out of the distribution of property which had belonged to the father and mother of the deceased and the wife of the appellant. Some ten years before the trial, appellant had killed a man by the name of Dickey, who was county commissioner, and upon his trial soon after that homicide was acquitted. Upon the issue in hand, it is the theory of the appellant that the combined or cumulative effect of the two homicides had brought about prejudice against him of such nature and extent

that he could not get a fair and impartial trial in the county. The homicide took place in Temple, a city of 15,000 inhabitants, and the witnesses called upon the hearing of the application for change of venue were residents of various parts of the county, including Belton, the county seat, and Killeen, a town of some 2,000 inhabitants in the western part of the county. The last previous census was said to have given the population of the county at some 46,000, and the estimated subsequent increase placed it at a larger figure. The number of qualified voters was somewhere in the neighborhood of ten thousand, one-half of whom were supposed to be males qualified for jury service.

Practically all of appellant's witnesses testified that in the particular community in which they resided they had heard the homicide discussed, and had heard expressions of opinion from persons in the community, most of which were unfavorable to the appellant. Only two of them, to whom reference will be made hereafter, claimed to have some general information. With this exception the testimony given by each of them related to information the witness had received in contact with people in the immediate community or those trading in that community. Both direct and cross-examination revealed the fact that the witnesses disclaimed any general information of the feeling in their particular community but they stated the conclusion that if such opinions as they had heard expressed were indicative of the general feelings in the community, that in their opinion a fair and impartial jury could not, under the procedure provided by law, be impaneled to try appellant's case from the community in which they lived. The cross-examination, going into details as to that matter, developed in each case the fact that there had been no general discussion; that neither the appellant nor the deceased were men of special prominence; that Dickey, who had been killed by appellant some years before, was county commissioner and therefore a man of general acquaintance and that at the time of the acquittal of appellant for the killing of Dickey some dissatisfaction was expressed. These witnesses each disclaimed any intention to convey the idea that they were acquainted with the general conditions throughout the county, or that their opinion or belief was based upon a general knowledge. From two witnesses who seem to us to base their opinions upon the broadest claimed knowledge, we take some quotations:

Mr. Burkes had resided in Belton, the county seat of Bell County, for twenty-six years; from 1904 to 1910 he was sheriff of the county and in that relation came in contact with people throughout the county. Since his retirement from office he had engaged in the real estate and insurance business and in his business capacity came in contact with many people. He had heard various people give expressions indicating that their feelings toward McNeely or towards his case were unfavorable, and from his acquaintance and knowledge he regarded it as improbable that under the procedure provided by law a fair and impartial jury would be impaneled in the county to try the appellant. He stated that there was prejudice against the appellant personally because of the two homicides. He had heard no expression favorable to the appellant. On cross-examination he said that since the death of Nichols, he had visited Killeen on one occasion to attend a funeral and that he did not mix with the people generally and that he had never discussed the homicide at all but had heard others do so; that he did not recall any recent expressions. Quoting him, he said:

"I wouldn't undertake to say, since I have not been into the various parts of the county, whether or not the qualified jurors in those respective parts of the county have formed any opinion about this case or not. I haven't been in the various parts of the county so as to ascertain whether or not there is any general prejudice existing against the defendant in the various parts of the county. I am expressing my opinion on account of some casual remarks I have heard, without getting into any discussion myself, mostly here in Belton and in Temple. In the county as a whole I have no personal knowledge of any general prejudice existing against him in the various parts of the county. * * * I expect that I have heard more than the ordinary citizen, expressions from different people, and none of these expressions have been favorable to the defendant's case or toward him. * * * Those whom I have heard express themselves seem to be personally prejudiced against him."

Mr. McGlown was engaged in the automobile wrecking business and since the homicide had heard different citizens express themselves unfavorable to the appellant. His business brought him in contact with people from all sections of the county. He said:

"Judging from the expressions which I have heard, I don't think that Mr. McNeely could get a fair and impartial jury who would render a fair and impartial verdict in this case."

In his cross-examination, he displayed a lack of knowledge of detail. Quoting him, he said:

"I don't know particularly what the people down at Bartlett or Holland or Rogers or Heidenheimer or Youngsport or Nolanville think about this case. I have heard some from Killeen, I think. I don't know their names; they live up in that direction."

He named but one man whom he had heard mention the matter.

Each of the witnesses introduced by the state testified concerning the communities in which they lived that the homicide attracted no unusual attention; that there had been very little discussion and that it was confined to the immediate time of the homicide, and there was no indication that the previous trial of appellant in which he was acquitted for the murder of Dickey had any bearing upon the minds of the people at the time or that any prejudice existed in the minds of the people against appellant or against his case. The facts of the case had not been detailed in the newspaper, and there had been very little, if any, expression of public opinion touching the guilt or innocence of the appellant. Practically all of the witnesses gave the opinion from their knowledge and acquaintance with the public in their particular communities and some of them in a broader scope of territory expressed the opinion that there was no prejudice and no impediment to the impanelment of a fair and impartial jury to try the appellant by the means ordinarily adopted and provided by law for selecting jurors. Most of these expressed the view that if there had been any unusual sentiment or expression of opinion that it would have come to their attention. There was evidence introduced by the state showing the localities of the various places from which witnesses were called. The venire list was introduced and some testimony given touching the locality from which each of the veniremen came or in which each of the veniremen resided. The venire was composed of 200 men and as we understand the record, the state returned 13 challenges and the appellant 15. Two of these were exercised after the eleventh juror was selected and there is no specific complaint of any objectionable, prejudiced juror having been selected, and nothing in the motion for new trial indicating misconduct or improper conduct with reference to the case.

Touching the duty of the trial court and of this court upon an application for change of venue, the law, as deduced from

the statutes and the decisions is, as we understand, that where the application is upon the ground of prejudice and is controverted, the burden is upon the accused to prove the existence of such prejudice against him or against his case that it is not probable that he can have a fair and impartial trial.

The duty is upon the trial court to weigh the evidence and if therefrom there arise conflicting theories, one tending to show prejudice of the nature mentioned and the other the contrary, the discretion as to the court is to adopt either. In the absence of abuse of this discretion the judgment is not to be disturbed upon the appeal. If, however, the evidence is such that it leads to the conclusion that bias, prejudice or pre-judgment of appellant or his case is such as to render it improbable that a fair and impartial trial can be given him, the trial court is without discretion to refuse the application. See Carlisle v. State, 255 S. W. Rep. 991, and authorities therein collated.

On the issue of prejudice the greater number of witnesses who testified upon behalf of the appellant, were residents of the cities of Temple, Belton and Killeen, though there were five other localities represented. On the same issue, some of the witnesses for the state were residents of the same localities in which the appellant's witnesses resided. However, those of the state included witnesses from nine or ten other localities which we understand from the evidence to be different election precincts. For both the appellant and the state the witnesses included men of various vocations, practically all of them being persons of maturity, business association and long residents in the county. Each of them included merchants, peace officers, bankers, farmers and others. We have been unable to perceive any advantage in favor of the appellant's witnesses, either in intelligence, experience or means of knowledge which would warrant this court in concluding that they were more worthy of credit or their judgment better founded than those for the state. The trial judge who heard the witnesses was acquainted with their localities and environment, and doubtless many of the individuals manifestly was in a position far superior to that possessed by the judges of this court to determine the issue. Moreover, to the trial judge the law committed the decision, leaving to this court only the right to review and reverse his judgment in the event the record reflected an abuse of the discretion vested in him. Upon the present record we

are unable to perceive any tangible ground for this court to decide that in refusing to change the venue the learned trial judge abused the discretion vested in him by the law.

Appellant insists that by reason of the penalty assessed, it is manifest that the venue should have been changed. In deference to this contention, we have examined the evidence heard on the merits of the case, embraced in more than 275 pages, and make a necessarily meager synopsis of our understanding of the testimony.

During the life-time of John Nichols, he and his wife gave to each of their children property in varying amounts. Upon his death, John Nichols devised and bequeathed to his wife, Mrs. Susan Nichols, the remainder of his property. She expressed a wish to give to each of the children property in addition to that which they had respectively received during the life-time of their father. In carrying this intention into effect, she seems to have called in as advisers her son, J. W. Nichols, deceased, and two of her sons-in-law. The result of this division was deemed by the appellant unfair to his wife. He claims that there had been discrimination against her for which he blamed the deceased. It appeared that John Nichols, during his life-time and many years before his death, had conveyed to his son, John W. Nichols, a tract of land which at the time was unimproved, stating at the time that in his subsequent distribution of his property he desired this tract of land to be regarded as an advancement to John Nichols and charged to him at the rate of $40.00 per acre. At the time of the death of John Nichols Sr. the land which belonged to his estate had advanced in value and was worth more than $80.00 per acre. In the transaction in which wife of John Nichols Sr. made gifts to her children, she gave to the wife of appellant a tract of land adjoining the tract which had been given to deceased during the life-time of his father, and the mother of appellant's wife, in endeavoring by gifts to each of her children during her life-time to equalize the value of the property which they had received, including that which had been advanced by them during the life-time of their father, **estimated** the value of the tract of land which she was giving to the wife of appellant at $80.00 per acre. Appellant seems to have regarded this transaction as a discrimination against his wife. Growing out of this matter and several years before the homicide, appellant and deceased had a difficulty, according to the testimony, and thereafter appellant, in conversation with

some of the witnesses, expressed ill-feeling towards the deceased in emphatic and abusive terms. Conversations of this nature are brought into the record by several of the state's witnesses, some of them carrying expressions of ill-feeling at a time very near the date of the homicide, one of them going to the extent of a threat to kill made a few days before the homicide. In his testimony describing the incidents immediately attending the homicide, appellant said in substance that while in the city of Temple upon business, he observed the deceased at a point on the street near the place of business of Mr. Cox. Deceased was engaged in a conversation with a man in Temple. Appellant stepped up to deceased and said: "Billie, I want to talk to you when you are through there, and stepped back some eight or ten feet." In a very short time deceased discontinued his conversation and stepped near the appellant, who then said to deceased: "I want to ask you about the way you have been treating my wife." Deceased said that he had not been mistreating her. Appellant said: "You know you have." Deceased said: "What about, I haven't mistreated her." Appellant said: "You know damn well you have." He said further:

"You have mistreated her about the partition of that land, and mistreated her about that check and mistreated her about the field notes also. You never did give her the field notes and they were turned over to you. You have got her mother turned against us. Her mother was at my house and your boy came and taken her away the next morning, and in a day or two he passed there with my wife's mother, and she was on the gallery and she didn't even speak to her and has never been back since. My wife has been treated worse than a negro."

"Deceased said, 'You are a liar' and knocked me back and blood came down in my face and as I stepped back he stepped forward and hit at me again, and as he hit at me that time I was trying to get my gun and trying to knock the lick off. As I started to shoot his right hand dropped to his pocket and I fired as fast as I could from then until the shooting was over. I shot until I saw him start to fall, and then I quit."

The wife of deceased testified that while she was engaged in shopping, she saw appellant talking to her husband. Appellant appeared angry and she ran to them as fast as she could and reached them before any shot was fired. According to her testimony, she grabbed McNeely and said: "Please don't do that," as he was about to draw his pistol. He drew the gun

and while she was there fired two or three times. Quoting her testimony, she said:

"I was right at him at that time. I spoke to him, pleaded with him not to do that. I spoke loud enough for him to hear. He paid no attention to me at all. I was standing right by him when he fired the first shot. Mr. Nichols wasn't doing anything to him at that time. The position of Mr. Nichols' hands when he fired at him was that he just backed back when he saw the gun and threw up his hands. His hands were open. I was looking at him at that time and he didn't have any weapon or anything in his hand. Mr. McNeely shot."

On cross-examination she said that she did not see her husband strike McNeely; that she did not see any blood on McNeely's face at that time. His hat was on at the time. She was looking right at the parties but saw no licks passed before the shooting. She saw McNeely talking and shaking his head and that he looked like a vicious madman. She said further:

"Then when I got to him, about the time I got to him, I asked him to please don't do that, but he shot. I hadn't seen Mr. Nichols open his mouth. I didn't see him pass any licks at all. I didn't see them catch hold of each other. As to how close they were together when Mr. McNeely pulled his gun, well Mr. Nichols had backed and they were not right together. He had backed off some. * * * I was looking right at the parties. If he had hit him, I think I would have seen him. I didn't see the parties together in any kind of a fist fight or scuffle at any time on that day. I didn't see them fighting."

Several witnesses testified that after the shooting, McNeely's hat was off his head; that he had blood running down his face and some of it had dropped on his shirt, and there was a wound upon his head which was described as a cut about an inch long through the skin to the bone where the flesh was thin. It was high upon his head and below the ear line. After he was killed, deceased was removed by an undertaker who found in the coat pocket of deceased a piece of iron weighing about three-quarters of a pound, which was introduced in evidence, and testimony given that in the hands of a man of ordinary strength, this piece of iron was such as might have inflicted serious injury. Some of the eye-witnesses testified that before the shots were fired the deceased struck McNeely on the head. They disclaimed seeing any weapon or anything in the hands of deceased. One witness said:

"It seemed Mr. Nichols warded off a blow with his left hand and hit with his right, and apparently staggered appellant back three or four feet."

The witness Cox, hearing the first shot, looked up and saw McNeely shooting. He said:

"Mr. Nichols was running up and down and Mr. McNeely was also playing up and down, back and forth, on the sidewalk. * * * I could see Mr. Nichols. I didn't see anything in his hand. I didn't see him making any effort to attack Mr. McNeely. Mr. McNeely had his pistol in his right hand." The witness also saw Mrs. Nichols and heard her scream.

If the jury had the right under the evidence to find the appellant guilty of murder, this court would not be authorized to annul the conviction because of the penalty assessed. The extent of the power of this court in the matter is to determine whether the evidence is sufficient to support a conviction of the offense of murder. That being determined in the affirmative, the penalty, within the terms of the statute, is left to the discretion of the jury. Williams v. State, 96 Texas Crim. Rep., 144. In considering the sufficiency of the evidence, the law requires that all controverted matters be regarded as settled by the jury in favor of the State. Observing these principles, this court cannot assent that the homicide was not committed upon malice. There was evidence of express malice. The jury has determined that the homicide was not justifiable on the ground of self-defense, nor mitigated to the degree of manslaughter.

There have been pointed out and we have discerned no faults in the receipt or exclusion of evidence, nor in instructing the jury as to the law. Without reaching beyond its province, and entering the domain committed by our law to the jury, this court cannot set aside the verdict in the present case.

The judgment is affirmed.

*Affirmed.*

ON MOTION FOR REHEARING.

HAWKINS, JUDGE.—It is admitted that when the request for change of venue was presented in the lower court the evidence heard was such that this court would not be warranted in disturbing the judgment of the trial court upon that question. However, it is insisted that it was the duty of the trial court in passing upon the motion for a new trial to have considered all the evidence heard upon the trial, as well as the result thereof, in connection with the evidence introduced upon the issue of change of

venue, in determining whether the court had committed error in ruling upon the venue matter, and that this court should consider the question in the same light. In support of this proposition we are referred to Barnes v. State, 59 S. W. 882; Barnett v. State, 176 S. W. 580; Cox v. State, 90 Tex. Crim. Rep. 106; 234 S. W. 72. The facts of the cases named are so different from those disclosed by the present record we would not regard them as authority indicating any error was shown in denying appellant's request for a change of venue. We think the facts warranted the jury in reaching the verdict returned without leading to the conclusion that any bias or prejudice existed in their minds against appellant.

The motion for rehearing is overruled.

*Overruled.*