J. A. BOND v. THE STATE.

No. 15045. Delivered May 11, 1932.
State's Rehearing Denied June 15, 1932.
Reported in 50 S. W. (2d) 813.

270

[redacted]

The opinion states the case.

*D. J. Brookreson,* of Benjamin, for appellant.

*T. L. Price,* District Attorney, of Post, and *Lloyd W. Davidson,* State's Attorney, of Austin, for the State.

CHRISTIAN, Judge.—The offense is murder; the punishment, confinement in the penitentiary for fifty years.

It was charged in the indictment, in substance, that appellant, with malice aforethought, killed J. C. White by shooting him with a gun.

Appellant was employed by the State Highway Department and was engaged in working on the highways in Terry county. He and his family lived in the town of Brownfield, they having moved to Terry county something over two years prior to the homicide. Deceased ran a grocery store in Brownfield, where he had lived for several years. Appellant and deceased had been good friends, appellant's boy having been employed by deceased in his grocery store. Deceased had a young daughter, who went with appellant's son. The daughter became pregnant and named appellant's son as being responsible for her condition. Deceased became enraged and threatened to kill appellant's son. According to appellant's testimony, he came to his house with a pistol, threatening his boy's life. Other witnesses gave testimony touching this threat. After appellant and deceased had talked the matter over, they decided to take the boy and girl to New Mexico and let them marry. Going to New Mexico, they secured a marriage license. After the wedding the boy and girl came back to Brownfield to live in deceased's home. In a few days a baby was born. A little later appellant's son left his wife. Deceased again became enraged, according to the testimony of appellant's witnesses, and threatened to kill appellant's son. One witness testified that deceased told him that he ought to have killed both appellant and his son before the mar-

riage took place. Deceased said, further, that appellant's son could not stay in the town of Brownfield. Some time thereafter the son returned to Brownfield and deceased made him leave. According to appellant's testimony, he tried to get transferred to a highway in another county, in order that he could be away from deceased, and avoid trouble. His testimony was to the further effect that deceased threatened both him and his son. Further, appellant said that it was his desire that his son live with his wife. It was the state's theory that after the boy left Brownfield the second time the trouble between deceased and appellant died out, and that there was no animosity on the part of deceased toward appellant. It was appellant's theory that deceased continued to bear animosity toward him and succeeded in having him discharged from the highway force.

Some time after the trouble between appellant and deceased relative to their children, deceasd advised Mr. McBride, who had charge of the highway forces, that appellant was seeking to have him (McBride) transferred out of Terry county. Mr. McBride went to appellant and told him what deceased had stated to him. Appellant denied that he had made any effort to have McBride transferred. McBride took deceased's word in the matter and discharged appellant. However, he recommended appellant for a position on the highway in some other county. The state's testimony was to the effect that appellant had engaged with others in framing a letter to the highway department which would have been calculated to cause McBride to lose his job. Appellant denied that he participated in the matter. The morning after appellant was discharged by McBride, deceased was in a restaurant, sitting on a stool near the counter. According to the witnesses for the state, appellant entered the restaurant, called "Jay" (speaking to deceased), and began shooting at deceased. After firing the first shot appellant advanced some three or four steps. At the time he fired the last shot he was about three feet from deceased. Deceased had fallen from the stool at the time the last shot was fired. Four or five shots were fired in all by appellant. After firing the last shot, appellant said to deceased: "You double-crossed me." Witnesses for the state testified that deceased was making no demonstration toward appellant at the time he shot him. Further, they testified that deceased was unarmed.

Appellant testified, in substance, as follows: On the morning he met deceased in the restaurant he had made arrangements for a party to take him to Lubbock in order that he might apply for a position in the highway department there. He had gone to the restaurant for the purpose of meeting this party. When he entered the restaurant he did not know that deceased was in there and would not have gone in if he had known it. When he saw deceased he said: "Hello Jay." At this point we quote appellant's testimony as follows: "He (deceased) then turned around right quick, facing me. When he turned around he never did

say a word but just reached for his hip pocket. He just turned and faced me right quick and reached for a gun or I thought that it was what he reached for. I thought then that he was getting a gun. I thought he was going to shoot me. If I had not have thought he was going to kill me I would not have fired. I did that because I thought he was going to kill me."

Appellant testified that he had been advised that deceased had threatened to kill him. He said, in speaking of the trouble he had had with deceased about his son and deceased's daughter: "After that I would hear of Mr. White making threats against me or trying to do me or my boy harm; I would hear of those threats all the way along and it seemed that Mr. White at times would quiet down and it seemed that spells would come over him and he would make a threat, from the time of the wedding until the trouble ended."

Appellant testified that, from what he knew of deceased, and what he had heard people say of him, he believed he was a man who would execute any threat he had made. He said that at one time he stayed off of his work four days on account of threats that he had heard of deceased making. He testified, further, that a few days before the killing a Mr. Lane asked him if his boy was at home. He said that he believed deceased would kill him and the boy, but would kill him first. He testified, further, that a Mr. Earnest told his wife that he had better stay out of town or he would get killed. Appellant denied he said to deceased, after he shot him: "You double-crossed me." He denied that he shot deceased because he had caused him to lose his job with the highway department. Deceased's partner in business testified that deceased had threatened to kill appellant's son, and, further, that deceased had said appellant's son could not come back to Brownfield to live. Further, this witness testified, in effect, that deceased had said to him that if appellant tried to prevent him from keeping his boy away from Brownfield he would "beat him to it." This witness testified also to the fact that appellant had endeavored to avoid trouble with deceased. He said appellant would call on him and ask him to see if he could not keep down trouble between him and deceased. Another witness testified that deceased had said that appellant and his family were not human and that they were worse than dogs. Again, a witness for appellant testified that deceased had said that appellant and his boy could not live in the country with him unless appellant made his boy live with his girl and do the right thing by her. He said he communicated this matter to appellant. One witness testified that a few days before the killing deceased told him that he was going to get appellant's son, but that he was going to get the old man (appellant) first. He said he did not communicate this threat to appellant, but told appellant's wife to tell appellant to stay out of town as he would get killed if he came to town. Several witnesses, among them

being officials of Knox county, where appellant had lived, testified that appellant's general reputation for being peaceable and law-abiding was good. The state made no effort to controvert this testimony.

Appellant complained of the action of the court in refusing to grant his application for a change of venue. Upon the issue made by the state's controverting affidavit, evidence was heard. As we understand the testimony, the ten witnesses used by appellant advanced points as follows: Shortly after the homicide the case had been generally discussed in the county at large. The question as to whether appellant was guilty or innocent had been freely discussed. Some people had been heard to say that appellant ought to have the electric chair. Several had stated what they thought ought to be done with appellant. Most of these witnesses had heard no one say that appellant ought to be turned loose. One witness had heard one man say that appellant should be turned loose. This witness had also heard some people say that when the case was fully developed that people would change their opinion and would be more favorable to appellant. Deceased had relatives by blood and marriage in the county. He had many relatives by marriage, who lived throughout the county. These relatives were generally prominent, were engaged in business and were land owners, some of them having tenant farmers. Deceased had lived in the county for many years, was well known and popular. He had many friends in the county. His relatives were old settlers. Appellant was practically unknown in the county and had lived there only a little more than two years. Based on the fact that deceased had many relatives in the county, and, further, on the discussion they had heard, these witnesses were of the opinion that appellant could not receive a fair and impartial trial in Terry county. Most of them were of the opinion that, generally speaking, there was prejudice against appellant. One of the witnesses was a Baptist preacher, who had held meetings over a large portion of the county subsequent to the homicide. He testified that he had heard the case freely discussed, and was of the opinion appellant could not receive a fair and impartial trial in the county.

The twenty-one witnesses used by the state were drawn from the official family at the court house, from business men and farmers. The sheriff, in testifying for the state, declared that he had not heard much discussion of the case, but stated that, ordinarily, people would not talk to him much about any prejudice they had in matters of the nature under consideration. He said: "Taking the relatives (of deceased) as a whole they are a good big number. Quite a good many in different lines of business." He testified, further, that of his own knowledge he did not know of any prejudice against appellant, and believed that he could. get a fair and impartial trial. As to the basis of this opinion, he said: "My opinion is based on the confidence I have in the people that they are

good honest citizens and will try a case right." The district clerk entertained the same opinion as the sheriff. He said the voting strength of the county was 2,300 and that there were approximately 1,400 jurors in the county. His testimony was to the further effect that on the day of the homicide there was a good deal of discussion pro and con concerning the killing, but that he had not heard much recently. He said he heard it both ways the first day. He said: "As to whether my opinion is based on the confidence I have in the people, I think we have as good citizens here as anywhere." The county attorney was of the opinion that appellant could get a fair trial, saying: "My opinion about him getting a fair trial is based on the fact that I have the utmost confidence in the good citizens of this county; that goes a long way with my judgment." The tax assessor, in testifying for the state, said: "Deceased had lots of relatives in the county—marriage and blood relatives together." He said, further, from what some people had told him, they had their minds made up as to whether appellant was guilty or not. Some people had told him that they would not be able to sit on the jury because they had their minds made up. He was of the opinion that appellant could receive a fair and impartial trial in the county, saying that he had not heard many people say they had a fixed opinion. Other witnesses for the state testified that the case had been generally discussed shortly after the killing, but that they had heard little discussion for some time prior to the trial. One witness said that people wondered what the facts were immediately after the killing. Another witness for the state testified that he had heard a good deal of talk about the killing and hardly knew whether appellant could get a fair trial or not, though he believed that he could. He said he was basing his opinion on the discussion in the community in which he lived. He said: "I do not know of any prejudice existing against him (appellant) but there is some talk against him." On redirect-examination by the state, he said that he thought that this talk was against the crime of murder. He testified, further: "I think most people or people in general, the evidence might change them. I think most of the people would be easily changed if the evidence showed it." Several of the state's witnesses testified that from their knowledge of the citizenship, they were of the opinion that appellant could secure a fair trial. Some of them said that they knew of no prejudice against appellant. State's witness Strickland, who was publisher of the only newspaper in Terry county, testified that the case was freely discussed at first. He said that there was possibly some sentiment against appellant, but that he did not believe it would affect the jury. He testified that he had confidence in the strength of jurors to disregard what they had heard and give appellant a fair trial. He said that he had nine hundred subscribers to his paper in the county at large. He said, further, that he wrote an article in his paper relative to the homicide im-

mediately after it occurred. This article, which was given circulation over the county at large, was in part as follows:

"PROMINENT MERCHANT KILLED . SUNDAY MORNING

"J. A. White Shot Down In Cafe Here Sunday Without Chance For Life. Self Acknowledged Killer Carried To Jail In Another City. Charged With Murder.

"One of the most harrowing affairs that has ever come up during the history of Brownfield and Terry County was transacted here early Sunday morning, when it is alleged J. A. Bonds walked into the Busy Bee Cafe where J. A. White, local grocery merchant, was drinking coffee and began shooting, after saying a few words to his victim, according to the cook of the cafe. The town was immediately thrown into excitement and grief, and a great crowd was soon on the streets. Bonds got a man to carry him to the Sheriff immediately, who left town with him to avoid any possible violence, although there was never any manifested. Bonds told Jim Miller, who carried him to the Sheriff, that he had killed Jay White, as well as the same thing to Sheriff Mon Telford when he handed the Sheriff his gun. He was formally charged with White's murder by Justice of Peace, J. E. Shelton, Monday, but has not to this time been given a preliminary hearing. In fact, no one except the Sheriff seems to know where he is jailed.

"An inquest, in which a verdict of murder was returned, was held Sunday by Coroner J. E. Shelton.

"The cook in the restaurant was the only witness to the shooting. He testified at the inquest Sunday morning that while White was drinking coffee, Bonds entered through the front door, and called White by name, and when the latter turned around to see who had spoken to him, Bonds drew a revolver and after saying: 'You have double crossed me,' fired one shot.

"White jumped from· his chair, the witness continued and started to run around the corner of the counter, when Bonds fired three more shots. White crumpled to the floor. Bonds then walked behind the counter, the cook said, and shot the grocer in the head.

"The cook testified that Bonds walked out of the restaurant without saying a word.

"The inquest was attended by County Attorney W. W. Price, who assisted in interrogating the witnesses.

"An examination of White's body showed one bullet pierced his abdomen; another near the heart and two his left arm. The fifth bullet penetrated White's brain.

"A .38 calibre gun was used.

"Both White and Bonds were married and had several children.

"Funeral services were conducted at the Methodist Church with his

pastor, Rev. Geo. E. Turrentine, in charge. He was assisted by Rev. J. M. Hale of the Baptist Church, as well as Revs. Curry and Hoover. The largest crowd by far assembled at funeral here, assembled at the church which quickly filled the several hundred seats except those reserved for the family, the pall bearers and the Masons and Odd Fellows. Perhaps as many again people who could not get in swarmed the grounds of the church outside with bowed heads. After the services, the Masons took charge and buried him with the honors of that fraternity. No words of ours need be said to the esteem in which the victim was held. The huge crowd of sorrowing friends and relatives, profuse floral display, spoke louder than any puny words of ours. The sympathy of the entire community goes out to the widow and children and other relatives."

According to our analysis of the testimony, it reveals that the case had been generally discussed throughout the county immediately after the homicide; that the only newspaper in the county had written an article which placed appellant in an unfavorable light; that deceased had relatives by marriage all over the county who were old settlers; that deceased was generally and favorably known in the county; that in the town of Brownfield, where the killing occurred, and in which deceased was engaged in the grocery business, most of the people came to trade; that appellant had lived in the county only two and one-half years and was practically unknown; that a number of the witnesses for the state based their opinion that appellant could receive a fair and impartial trial on the fact that they had confidence in the citizenship of the county and believed that they would be governed by the law and evidence irrespective of the fact that the case had been generally discussed.

Appellant exhausted fourteen of his peremptory challenges. In the motion for a new trial appellant renewed his application for a change of venue and alleged that four persons who were related to deceased by marriage had sat on his jury. On the hearing of the motion, it developed that four of the jurors were distantly related to deceased by marriage. These jurors said that the relationship was so distant that they did not think of it at the time they were questioned on their voir dire. Some of them said that they did not know at the time that they were related to deceased. They declared that they were not prejudiced against appellant. The bill relating to the application for a change of venue recites that two of the veniremen were excused at the time the jury was being qualified on account of relationship. The court certifies that in exercising the fourteen challenges appellant cut off jurors who had shown themselves to be qualified and who were without prejudice and not related to deceased.

The opinion is expressed that under the circumstances disclosed by the record, the venue should have been changed. Considering the entire evidence in connection with the prominence of deceased, the penalty assessed, the wide acquaintance of deceased in the county, the fact that his

relatives by marriage were many and lived over the county generally, the free discussion of the case immediately after the homicide, the fact that, although great care was taken, four persons distantly related to deceased were placed on the jury, and, further, considering in connection with these facts the newspaper report which was unfavorable to appellant, and given wide circulation over the county, we are unable to escape the conclusion that prejudgment of appellant and his case rendered it improbable that he could obtain that character of fair and impartial trial contemplated by the Constitution. It is the general rule that if conflicting theories as to prejudice arise from the evidence, the trial court has the discretion of adopting either theory, it being his duty to weigh the evidence. McNeely v. State, 104 Texas Crim. Rep., 263, 283 S. W., 522. However, when the evidence is such that it leads to the conclusion that bias, prejudice or prejudgment of appellant, or his case, is such as to render it improbable that a fair and impartial trial can be given him, the trial court is without discretion to refuse the application. McNeely v. State, supra; Parker v. State, 111 Texas Crim. Rep., 140, 12 S. W. (2d) 213.

The judgment is reversed and the cause remanded.

*Reversed and remanded.*

The foregoing opinion of the Commission of Appeals has been examined by the Judges of the Court of Criminal Appeals and approved by the Court.

### ON STATE'S MOTION FOR REHEARING.

MORROW, Presiding Judge.—Taking note of all the facts before the trial court and before this court, we are unable to escape the conclusion that the conditions at the time of his trial, portrayed by the record, were such as to render it improbable that the appellant could secure a fair and impartial trial in Terry county. The reasons for this conclusion are set out in the original opinion, and a restatement or repetition of them is deemed unnecessary.

The motion for rehearing is overruled.

*Overruled.*