PLACIDO HANDY v. THE STATE.

No. 20298. Delivered April 19, 1939.
Rehearing Denied April 3, 1940.

4

The opinion states the case.

*W. Kennedy Smith,* of Raymondville, for appellant.

*Lloyd W. Davidson,* State's Attorney, of Austin, for the State.

GRAVES, Judge.

This is the second appeal from a charge of murder, in both of such instances the death penalty was given by the jury. See 114 S. W. (2d) 878.

There is but one question presented herein for review, and that is the ruling of the trial court in refusing appellant's application for a change of venue. The application contained an allegation that there existed against appellant so great a prejudice that he could not obtain a fair trial in Hidalgo County. That the grounds of such prejudice were based upon the publicity given by the local newspapers of the trials that had been heretofore had of this and a companion case against one Ascencio Martinez, as well as other newspaper stories relative to the killing of this same person for whom this appellant was being tried. That the newspapers had borne stories relative to finding the body of this deceased person in the Rio Grande river; of the attempts to ascertain who was guilty of having caused the death of such person; of the arrest of appellant and five of his supposed confederates in the crime; of their statements relative to such crime; of the result of the first trials of appellant and Martinez, and of the reaction locally when these cases were reversed and remanded by this court. This application was supported by the oaths of W. D. Woodroof and D. C. Earnest as compurgators, and controverted by the district attorney who attacked by affidavit and otherwise the means of knowledge of such compurgators, and appellant's only bill of exceptions relates to and complains of the court's action in overruling his motion for such a change of venue, the burden of his motion being that on account of such widespread newspaper publicity given to such trials and series of events that this appellant's cause had been prejudiced by the citizenship of Hidalgo County, and that he could not obtain a fair and impartial trial therein.

The State, through its district attorney, vigorously combated such motion, and seems to have assumed the laboring oar in the hearing relative thereto.

D. C. Hogan testified that both Mr. Earnest and Mr. Woodroof, appellant's compurgators, had no means of knowledge towards the mental attitude of a large majority of qualified jurors in Hidalgo County; that they had no opportunity to contact such jurors save within a limited scope in and around the community of Edinburg and the northeastern part of said county. That under the last Federal census Hidalgo County was given a population of 77,004 and same had greatly increased since such census; there were ten incorporated towns in said county, four of which were larger in population than Edinburg; that the county in area embraced 1874 square miles, and contained numerous jurors who had never heard of these

cases, or who had no prejudice relative thereto; that the appellant is not well known in the county; that he is of Latin-American extraction, and practically the only jurors who know him will be those of the same extraction; that he can obtain a fair and impartial trial before a jury in Hidalgo County.

It was agreed by counsel for both sides that there were eleven incorporated towns in this county, and that their total population was 42,007, census of 1930.

The editors and circulation managers of the daily papers in Hidalgo County and its immediate vicinity testified relative to their different publications of the events surrounding these trials; they claimed such accounts were accurate and sometimes contained verbatim copies of certain portions of the testimony; that no editorials were written relative thereto however, and that they were only interested in same from a news viewpoint; that they made no effort to create a prejudice in the minds of the people, and did not think they had done so; that they had a combined total circulation of approximately 32000 daily papers; and that they knew of no reason why a jury could not be selected in such county that would give the appellant a fair and impartial trial.

.Hon. C. K. Richards, a practicing attorney who lived at McAllen, testified that he had been living at McAllen about six months, and in the County of Hidalgo almost two years, and in the Valley since 1925, and has a considerable acquaintance over the county; that he had heard these cases frequently discussed, and all such persons mentioning same believed that these Mexicans were guilty, and that he did not believe the appellant could get a fair trial in Hidalgo County. On cross-examination he said that he had attended one of the trials; that he had not discussed the case with any considerable number of prospective jurors, but that it was the general consensus of opinion on the streets of Edinburg that a fair trial could not be had; that he believed such opinion was influenced by newspaper accounts, as none of the people whom he heard discussing such matters knew anything of the facts; that he knew of no racial or religious prejudice, or prejudice of any other kind against the appellant. That his opinion was based on newspaper articles, and was subject to be rebutted.

Five additional witnesses were then offered by appellant, all of whom testified that based on newspaper accounts they had formed an opinion that appellant was guilty, and they did not think he could obtain a fair trial in such county; that they had never heard of any prejudice,—political, racial, religious or

otherwise,—existing against this appellant. One of the witnesses, Mr. Hemphill, testified that he had heard several people say "that a bunch of us ought to get together and go and get these men and short circuit the legal procedure;" that he did not know their names, and that he felt that way about it, but felt sure that everybody else in the county did not feel the same way. That witness thought the case had heretofore been reversed and dismissed by the higher court, and therefore thought that the men would never again be tried for a crime that they had confessed to, and he was outraged about such proceedings, and thus thinking he would have felt the same way about the case had it happened in Dallas or anywhere else in the State.

Mr. Livingston, one of the above witnesses, testified that he had no prejudice against the appellant or his case. Mr. Earnest, the third witness, testified that he did not believe anybody could get a fair trial in Hidalgo County in an election year, but knew of no prejudice against this particular defendant. That witness could give defendant a fair trial, had no prejudice against him, and from what he had read he did not believe defendant was guilty, and the people that he had talked to expressed doubt as to his guilt.

Mr. D. C. Hogan, a State's witness, said that he was assistant county auditor, had lived in the county since 1921, in public work practically all the time, having been an assistant county attorney; that he knew both Mr. Richards and Mr. Earnest, the two compurgators, and knew their probable acquaintance in the county, and means of knowledge of the sentiment of the jurors therein. Mr. Earnest has not driven an automobile for the past three or four years, and was not familiar with the sentiment of such jurors outside of the immediate locality of the city of Edinburg, and witness did not think that Earnest's information and knowledge of such citizenship was sufficient to enable him to express the sentiment of the citizenship of the county relative to this case or relative to affording the defendant a fair and impartial trial. Witness knew of no prejudice of any kind existing in the county that would prevent a fair and impartial trial in this cause. Mr. Earnest had been tax assessor of the county, and had been a deputy in the county tax assessor and collector's office; that he knew a lot of people in the county. Witness had a fixed opinion in the matter, but if he had only obtained such opinion by reading newspaper accounts, he would be able to set aside such newspaper accounts; that he had heard no expres-

sions of innocence relative to the defendant, and had heard expressions of opinions as to his guilt "if what I have heard is true." Witness thought that a jury of qualified jurors could have been gotten out of a venire of 100 to 150 men. There were between 8,000 and 10,000 qualified jurors in Hidalgo County; the case has not been widely discussed in the county, but only in the populated centers.

The witness Hogan also knew the compurgator C. K. Richards, who had resided in the county not over three or four years. He did not think him qualified to pass upon the qualifications of the prospective jurors in this case; Mr. Richards would only come in contact with those persons whom he reached in his law practice, and did not have a very extensive acquaintanceship over the county.

J. R. Ragland, a farmer and trucking contractor, had lived in the county nineteen years, knew people in various rural parts of the county, and worked a great many Latin-Americans; had heard of these cases, but never had discussed them with anyone; never heard this case mentioned, knew of no prejudice of any kind in the county that would prevent a fair and impartial trial being given this defendant; thought he could get a fair trial. He had read something in the paper about this case, but that would not influence him; he could sit as a juror in the case without any prejudice regardless of what he had read in the papers.

Gaston Riley was in the restaurant business in McAllen, did a rather large business, knew many people and had many friends; had read the headlines in the papers about the case; he believed the defendant could get a fair and impartial trial in Hidalgo County. He knew of no prejudice existing against the defendant of any kind, nor heard any such expressed. Witness could not say what other prospective jurors thought about the case; was only speaking for himself.

A. E. Guerra had lived in McAllen all his life; was twenty-seven years of age; was now in the wholesale grocery business, and had a fairly wide acquaintanceship in the county; had heard the case discussed among his friends and acquaintances, but had never heard of any prejudice of any kind existing in this county against the defendant; that he thought there were plenty of prospective jurors in the county who had not prejudged this case; most of the people in the towns, and some in the county, had read something about the case; that they might have formed some opinion thereon; that he thought

there were plenty prospective jurors who had not prejudged this case.

J. J. Frost ran a service station at Mission; had lived there seventeen years, and had many acquaintances over the county; knew of no prejudice existing against the defendant; in his opinion the defendant could get a fair and impartial trial from prospective jurors in the county; that he had heard no great amount of discussion of this case.

A. D. Dean had lived at McAllen since 1924, had a wide acquaintance over the county, had heard of these cases and discussed same with a few people, but not to any great extent; had never heard nor knew of any prejudice existing against the defendant, and believed he could get a fair trial in Hidalgo County. Hidalgo County was a cosmopolitan county; many of the citizens had never heard of this case; that he had a great deal of confidence in the fairness and integrity of the jurors of that county, and that he thought a fair jury could be found in that county as well as any other county of the State.

To practically the same general effect as the above was the testimony of E. E. Marburger who had lived in Mission since 1926, and was manager of the Great American Life Insurance Company, with a wide acquaintance over various parts of the county. Also to the same effect was the testimony of P. H. Longoria, J. D. Lauck, C. F. Goode, M. C. Smith, L. C. Lemen, G. L. Callis and G. E. Brittan, all fairly prominent citizens of Hidalgo County, having resided therein for a number of years, all of whom thought that a fair trial could be had in such county before an impartial jury.

J. E. Berry testified for the defendant that he was well acquainted over the county, and that he believed on account of the publicity given to these former trials, and the newspaper publications, the defendant could not get a fair trial in this county; that he had heard more discussion by word of mouth than he had read; that he knew of no racial, political or religious prejudice existing against defendant, but on account of the fact that it was such a heinous crime, that it was the general sentiment that these defendants were guilty, and should be sent to the chair.

Floyd Langford, a banker, had lived at Mercedes eighteen years, with a wide acquaintance over the county; did not recall having heard of these cases, though he had probably read of

them; had never heard them discussed and had heard of no prejudice against the defendant. He thought a fair and impartial jury could be had in the county; that there could be prejudice and he knew nothing about it, but if it had been widespread it would in all probability be known to him. He did not think such existed.

Ed. B. Olson, secretary and treasurer of the American Rio Grande Land & Irrigation Company, had lived in Mercedes sixteen years; had a wide acquaintance in the county; had never heard the case mentioned; knew of no prejudice of any kind against defendant or his case; thought a fair and impartial trial could be had in the county.

H. E. Hager had lived in the county twenty years; was city secretary of Mercedes; had also worked in the postoffice, and was fairly well acquainted in the county; had talked of the case once or twice; knew of no prejudice against the defendant, and thought he could get a fair trial in Hidalgo County.

W. E. Cooper lived at La Villa; had lived in the county ten years; was a merchant; had a general acquaintance over the county; had heard of this case, and read a good deal about it in the papers; believed that the defendant could get a fair and impartial trial in the county.

Carl I. H. Baker, a witness for defendant, lived in the northwestern part of the county near Stockholm; had been in the county for twenty-six years; had a wide acquaintance over the county; had heard of the case, and read a great deal about it; heard it discussed lots of times; the general opinion was that defendant was guilty; thought it would be hard to find a jury that did not know about the case, and who did not have their minds made up that defendant was guilty. That from what he had read and heard he thought defendant guilty; knew of no prejudice against the defendant; that if taken on the jury he could try the man on the evidence submitted and lay aside his opinion.

J. A. Glover, Jr., for the State, had lived at Mercedes about fifteen years, engaged in the grocery business; had a general acquaintance over the county; had heard of no prejudice; knew of no reason why a fair and impartial trial could not be had.

Jim J. Busby, a resident of the county for twenty-eight years, manager of a feed store at Mercedes,—testified to practically the same thing as all of the State's witnesses.

Joe Fernandez had lived in Mercedes all his life; was deputy tax assessor; knew about the case; knew of no prejudice; thought a fair trial could be had.

Harry Ratliff, secretary and manager of Weslaco; had lived there fourteen years; had a wide acquaintance; knew of no prejudice; thought a fair trial could be had in the county.

E. E. Salge, C. Spears, R. R. Talbert and A. P. Miller, fairly prominent citizens, having lived in Hidalgo County for a number of years,—knew of no prejudice, and thought a fair trial could be had.

K. C. Boysen, district clerk, for defendant, testified that this defendant had been previously tried for this offense in this county, a jury venire of 120 men being drawn; 67 of the 120 were summoned; that of those 67 five were excused before voir dire examination; eight were excused by agreement of counsel, one excused because of mistake in being summoned, and five were excused because of over age; that of the veniremen examined ten were excused for having scruples against the infliction of the death penalty; three because of holding opinions; one because not an American citizen, and one because not a householder in the county; that the State and defendant exercised twelve peremptory challenges.

Miss Mary Anne Makens, a deputy district clerk, testified that the trials of these defendants were well attended; there were people sitting in the windows; the court room was crowded; the court room was small; the largest number attending the trial she would estimate at about ninety people; this number was about the same as would attend other murder trials.

There was other testimony of witnesses relative to this application, but in the main it was all of a similar nature to the testimony of which we have given a brief synopsis above. The bill of exceptions is very lengthy, comprising more than 75 pages of the transcript, besides a large collection of clippings from newspaper accounts of the various times this cause had been before the courts. In the above quotations we have endeavored to give a short synopsis of the general trend of the testimony offered on the application for a change of venue.

This motion was overruled by the trial court, "subject to being granted at the conclusion of the voir dire examination of prospective jurors." The jury venire was then called, and ninety-nine prospective jurors were interrogated. The court asked the jurors collectively if they had formed any opinion regarding the guilt or innocence of the defendant, and twenty-

nine of them arose, and were excused by the court. The defendant exercised fifteen peremptory challenges and the State twelve such challenges, and the defendant was then allowed one extra peremptory challenge, which he also exercised. After the selection of the jury the defendant again offered his motion for a change of venue, which motion was overruled by the court. It is also shown by the bill that after having been charged by the court, the jury retired, and in four minutes returned into court with a verdict assessing the death penalty.

On account of the severity of the penalty, and the further fact that bill of exceptions No. 1 is the sole bill presented to us, we have gone to a great length in setting forth the testimony adduced thereunder in support of and in opposition to the motion for a change of venue. Narrowed down to its last analysis, this large amount of testimony shows that in the past two years, at intervals, the newspapers with a circulation of about 34,000 papers, have contained many articles designed to inform the public of the progress of what might be termed the "Donna murder cases," and have thereby informed the reading public of what might be termed the facts in such cases; that many people had read these articles, and of a necessity they had made some impression on them. That the consensus of opinion of practically all the witnesses was that there was no combination of any kind, and no prejudice,—religious, factional or otherwise,—against the defendant for the purpose of prejudging or influencing the outcome of his case. With this premise granted, we find ourselves relegated to one further proposition, and that is: Has such newspaper publicity created in the minds of prospective jurors in such county such a prejudice or prejudgment of this case that a fair and impartial trial can not be had therein?

Newspaper publicity and an opinion formed therefrom alone will not be sufficient to disqualify a juror. Art. 616, C. C. P., subdiv. 13, reads as follows: "That from hearsay or otherwise there is established in the mind of the juror such a conclusion as to the guilt or innocence of the defendant as will influence him in his action in finding a verdict. To ascertain whether this cause of challenge exists, the juror shall first be asked whether, in his opinion, the conclusion so established will influence his verdict. If he answers in the affirmative, he shall be discharged; if he answers in the negative, he shall be further examined as to how his conclusion was formed, and the extent to which it will affect his action; and, if it appears to have been formed from reading newspaper accounts, communications, statements or reports or mere rumors or hearsay,

and if the juror states that he feels able, notwithstanding such opinion, to render an impartial verdict upon the law and the evidence, the court, if satisfied that he is impartial and will render such verdict, may, in its discretion, admit him as competent to serve in such case. If the court, in its discretion, is not satisfied that he is impartial, the juror shall be discharged."

We also quote from Texas Jurisprudence, Vol. 12, p. 466, as follows: "In some instances the acts of a person accused of crime have been the subject of public controversy in which newspapers have taken part to a degree that rendered the publicity an important factor in creating such prejudice as would render it improbable that, pursuing the methods provided by law, an impartial trial could be had. It is not enough, however, for one seeking a change of venue to show the publication of newspaper articles in respect of the case; he must go further and show that by reason thereof there has been created in the public mind so great a prejudice as will prevent him from receiving a fair trial. Evidence of such publications and their circulation is generally received and considered relevant on the issue of prejudice. It may be shown that circulars were distributed narrating the details of the crime. But the fact that a given matter has been presented by the press and discussed by the people does not necessarily result in prejudgment. And an inference of prejudice, requiring a change of venue, is not to be drawn from the fact alone that newspapers published in the vicinity have contained articles descriptive of the offense, or editorials denunciatory of the accused, where the accounts are fair and not inflammatory, and apparently were published for the purpose of informing the public of current events and acquainting them with the facts in the case."

Again we quote from Baw v. State, 24 S. W. Rep. 293: "The refusal to change the venue was not error. The great weight of the testimony adduced upon the trial of the motion negatives the existence of the prejudice alleged, and the evidence does not show the existence of the combination of influence of persons set up. Under such state of case, this court has invariably refused to disturb the ruling of trial courts refusing applications to change venue." See Myers v. State, 77 Texas Crim. Rep. 239, 177 S. W. Rep. 1167.

We quote from Cox v. State, 90 Texas Crim. Rep. 106, 234 S. W. Rep. 72: "* * * It is a general and wholesome rule, we think, which declares that the inference of prejudice requiring a change of venue is not to be drawn from the fact alone

that newspapers published in the vicinity have contained news articles descriptive of the .offense or editorials denunciatory of the accused. Downs v. State, Amer. & Eng. Ann. Cases, Vol. 18, page 789, and notes; Ruling Case Law, Vol. 27, page 816, Sec. 36. Evidence, however, of such publications and their circulation is generally received and considered relevant. People v. Suesser, 132 Cal. 631; Com. v. Ronemus, 205 Pa. St. Rep. 420; Downs v. State, supra. This rule has been applied in this state in Gallagher v. State, 40 Texas Crim. Rep. 296; Faulkner v. State, 43 Texas Crim. Rep. 311; Cortez v. State, 44 Texas Crim. Rep. 169; Fleming v. State, 62 Texas Crim. Rep. 653."

We quote from Jackson v. State, 103 Texas Crim. Rep. 318: "* * * Because a given matter, necessarily two sided, and possibly many sided, has been presented by the press and discussed by the people, does not necessarily produce prejudgment. If it did, then men who read and talk with their neighbors and who might be regarded as informed and intelligent men, would be cut off from jury service."

We have thus laboriously attempted to go through all the testimony offered in this bill, as well as the exhibits of numerous newspaper clippings appended thereto, which clippings seem to contain matters of news, and are free from editorial denunciations of any character. It is worthy of note also that a jury was obtained out of the original venire, and no talesmen were summoned. That the death penalty was rendered by the jury in so short a time may have been easily attributable to the heinousness of the crime, which, if the State's testimony is to be believed, may have been sufficient to shock the conscience of any fair minded juror, and might have required but a short deliberation in arriving at the extreme penalty.

We are impressed with the soundness of the trial court's discretion when he exercised the same in overruling the motion for a change of venue, and, in such belief, this bill of exceptions is overruled. There are no further bills in the record, and we are only confronted with the facts adduced upon the trial.

The witness Guadalupe Bueno in November, 1934, found lodged on some obstruction in the Rio Grande river the dead body of a male person, about thirty-five years of age, about five feet five inches in height, weighing about 135 pounds. This body gave evidence of having been in the water for from four to six weeks; it had tied to it by a rope a portion of an old dismantled engine of a Model T Ford car; there were numerous tatoo marks thereon; it was partially clothed, and had a hat stuffed in a belt around the body. There were a number of

wounds on the body near the heart, some looked like dagger wounds, and some like knife wounds, and some like gunshot wounds; the front of the skull was crushed in, and the back of the skull was mashed and crushed in; the body was well preserved, and the facial features recognizable; his racial extraction could not be identified.

The witness Nicholas Yanez testified that he recognized the dead man as a person who, together with a woman, had spent the night at his mother's, Teresa Chapa's, house some few weeks prior to the time this dead body was discovered in the river. Teresa Chapa testified that some few weeks prior to the discovery of this dead body her son, Nicholas Yanez, brought a strange man and woman to her house, and they stayed there all night and part of the next day; she knew neither the man nor the woman; these persons had a grip and a trunk, and the man wore a wrist watch. After staying in her home all night, about 8 o'clock the next evening Placido Handy, the appellant, came to her house and got this man and woman, and loaded their baggage into Handy's car, and took them away with him; just before leaving appellant told her and Nicholas, her son, that if anyone came and asked if he took this family away, to please not tell anybody. Appellant then got in the car with this man and woman and drove away from her house in the general direction of where this dead body was afterward found. That she never again saw this man and woman.

The testimony of Jose Rodriguez, a self-confessed accomplice, testified that he, together with six others, among them appellant, took this man and woman to a point on the Rio Grande River near what was called the "Red House"; that they tied the man to a tree, and each one raped the woman, and two of his companions raped her twice; that the woman was begging them to kill her rather than treat her in such manner. That they killed the man by beating him with pieces of iron, by shooting him, and by stabbing and cutting him, and that they then stabbed and cut the woman, and then shot her; that they then obtained these pieces of an old Ford engine and tied one piece to the man's dead body, and another piece to the woman's dead body, and took the bodies in a boat out in the river and threw them in the water.

The State introduced appellant's confession, to the introduction of which we find no objection, in which he amply corroborates the accomplice, and shows therefrom a conspiracy to rob and kill this unknown man and woman, and shows the carrying out of this conspiracy, and the disposition of the bodies in the Rio Grande river; it shows the division of the prop-

erty of these two unfortunate persons among the conspirators, followed by their fancied immunity for a period of two years, and then the supposedly voluntary statement of appellant, as well as one of his confederates in the crime. The river has never given up the body of the woman, she having a heavier piece of iron tied to her than the one tied to the man, but this unknown man's dead body was mute evidence of the truth of the statement made, fully evidencing the truth of the statement of this appellant. Though their wage was small, they did their work well, and the State, though delayed, convinced the jury thereof, and we confess we see no other verdict reasonably probable under the circumstances than that of appellant's guilt; and it is our opinion that the penalty assessed was fully merited by the uncontradicted facts.

The judgment is affirmed.

### ON MOTION FOR REHEARING.

HAWKINS, Presiding Judge.

Appellant insists in his motion for rehearing that we were in error in not sustaining his contention that the trial court should have ordered a change of venue.

We are cited to a number of cases which are thought to sustain appellant's position, particularly Bond v. State, 121 Tex. Cr. R. 269, 50 S. W. (2d) 813; Richardson v. State, 126 Tex. Cr. R. 223, 70 S. W. (2d) 1003; Blackshear v. State, 126 Tex. Cr. R. 417, 72 S. W. (2d) 601. It is difficult to find a case which is a controlling precedent upon the question of change of venue for the reason that each case turns upon the facts in that particular case, hence precedents are not very helpful save as they announce general principles which may be applicable in the case presently under consideration.

In Willis v. State, 128 Tex. Cr. R. 504, 81 S. W. (2d) 693, this court said: "Nothing is better settled than that in determining whether the trial court abused his discretion in refusing to change venue each case must be decided upon its own facts. No two cases are alike. Many holdings of this court are reviewed and cited in the able briefs of both counsel for appellant, who are to be highly commended for their earnest effort in a cause wherein they were appointed by the court and served without pay as faithful officers of the court. We do not find any case enough like this on its facts to justify holding it a precedent."

To illustrate how the variant facts may impress the court in passing upon the question before us we refer to Richardson v. State, (supra). There the trial judge reserved his ruling until he heard the statements of the veniremen, and their evidence on voir dire examination was made a part of the record. Out of 81 prospective jurors examined 68 entertained the opinion that Bond was guilty, and a number of them had themselves expressed opinions about it. The trial judge in the present case reserved his ruling until the veniremen were examined. Ninety-nine prospective jurors were examined. Forty-five were excused because of opinions. Only two stated what their opinion was, and both stated that they believed appellant was innocent. The jury was secured from the remaining 54 veniremen, and each juror chosen said he had no "opinion or impression" as to the guilt or innocence of appellant.

In Bond's case (supra), he was a comparative stranger in the county, while deceased was generally and favorably known; had many kinspeople, both by blood and marriage, scattered all over the county. Two of the veniremen were excused because they were related to deceased, and after the trial it was discovered that four men who had sat on the jury were distantly related to deceased by marriage.

It is appellant's position here that the newspaper stories regarding the killing caused a prejudice to exist against appellant. Whether or not this was true became a question of fact on the issue joined between appellant and the State. It was our effort in the original opinion to make a fair condensed statement of the evidence pro and con on such issue.

The evidence before the trial court and before us makes necessary the application of the rule stated very clearly in Carlile v. State, 96 Tex. Cr. R. 37, 255 S. W. 990, as follows: "The statute fixes the measure of the court's duty upon an application for a change of venue, namely, to grant the motion where, upon the uncontroverted motion or upon the evidence adduced, it is made to appear that there exists in the county 'so great a prejudice against (the appellant) that he cannot obtain a fair and impartial trial.' Code of Crim. Proc. art. 628. The burden is upon the appellant to prove the existence of such prejudice, and, where evidence is heard, the issue is to be determined by the trial court. The discretion is upon the trial court to weigh the evidence, and, if from it there arises two conflicting theories, the trial court has the discretion to adopt either. In the absence of the abuse of this discretion, the judgment will not be disturbed on appeal. If, however, the evidence is such that it leads to the conclusion that the bias, prejudice,

or prejudgment of appellant or his case is such as renders it improbable that a fair and impartial trial can be given him, the trial court is without discretion to refuse the application. Dobbs v. State, 51 Tex. Cr. R. 632, 103 S. W. 918. Injury is shown when it is made evident under the procedure provided by law it is improbable that an impartial jury can be impaneled to determine the guilt of the accused, and a change of venue is denied. Barnes v. State, (Tex. Cr. App.) 59 S. W. 883; Randle v. State, 34 Tex. Cr. R. 59, 28 S. W. 953; Cox v. State, 90 Tex. Cr. R. 106, 234 S. W. 72, and cases cited."

Other cases in which the same rule has been applied are Parker v. State, 91 Tex. Cr. 68, 238 S. W. 943; Walker v. State, 98 Tex. Cr. R. 663, 267 S. W. 988; Davis v. State, 101 Tex. Cr. R. 352, 275 S. W. 1029; Walker v. State, 124 Tex. Cr. R. 112, 60 S. W. (2d) 455; Fulton v. State, 132 Tex. Cr. R. 192, 103 S. W. (2d) 755. Because of the extreme penalty, and appellant's insistence that we erred in our original opinion the evidence on the issue of change of venue has again been most carefully examined, and we feel that this court would not be justified in holding that the learned trial judge abused his discretion in declining to change the venue under the evidence on that issue.

The motion for rehearing is overruled.